UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| SAMANTHA COOK, DONNA COOK, CASADIE ZELETSKY, JOE BAUCOM, DIANE BAUCOM, and KRISTI SMITH, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>GENERAL MOTORS LLC, a Delaware Limited Liability Company,<br><br>Defendant. | Case No.: 1:26-cv-00229-RGA<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1.      Plaintiffs Samantha Cook, Donna Cook, Casadie Zeletsky, Diane Baucom, Joe Baucom, and Kristi Smith, individually, and on behalf of all persons in California, New Hampshire, Maine, Missouri, and the United States who purchased or leased any 2024 to present Buick Encore, 2024 to present Buick Envista, 2024 to present Chevrolet Trailblazer, and 2024 to present Chevrolet Trax vehicles equipped with a 1.2-liter turbocharged inline 3-cylinder gasoline engine (RPO LIH or LBP) ("Engine") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced by Defendant General Motors LLC ("GM" or "Defendant") ("Class Vehicles" or "Vehicles"), bring this action. Plaintiffs allege as follows:

**INTRODUCTION**

2.      This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

3.      Defendant manufactured, marketed, distributed, and/or sold the Class Vehicles without disclosing that the Class Vehicles' engine assemblies and related components, including connecting rods and engine block housings assemblies ("Engine System") were defective.

4.      Specifically, Plaintiffs are informed and believe, and based thereon allege, that the defect in the Class Vehicles results in sudden and catastrophic engine failure during normal

driving, often involving connecting rod ejection through the engine block, leading to rapid loss of power, fluid leakage, and potential fire (the "Engine System Defect" or "Defect"). As further described below, discovery will show that improperly designed and/or manufactured internal engine components, lubrication passages, and casting features result in these failures, including bearing and connecting-rod damage, oil starvation, and engine-block porosity.

5.      Among the most concerning consequences of the Engine System Defect is the sudden and complete loss of propulsion and steering assistance that occurs while the vehicle is in motion, often at highway speeds. Owners report hearing a loud mechanical bang or knocking sound immediately before the vehicle decelerates uncontrollably. In many cases, a connecting rod pierces the engine block, discharging oil and coolant across the roadway and onto hot exhaust components, producing dense smoke and flames. The abrupt loss of motive power and the potential for engine-compartment fires place drivers, passengers, and surrounding motorists at imminent risk of collision and serious injury.

6.      Additionally, drivers frequently describe the onset of the failure as a sharp metallic knock or rattling noise followed by an immediate loss of acceleration, illumination of multiple warning indicators, and the smell of burning oil or coolant. The vehicle may shudder violently as the engine seizes or throws a connecting rod through the block, leaving the driver without propulsion or steering assist. Smoke and fluid discharge often obscure visibility for nearby motorists, and several owners have reported flames emanating from beneath the hood within seconds of the failure. These events occur without warning and leave drivers stranded in active traffic lanes or on highway shoulders, creating an acute and unreasonable safety hazard.

7.      Defendant sold the Class Vehicles with a 5-year/60,000-mile Limited Powertrain Warranty ("LPW"), which expressly covers the engine, transmission, drive system, and transaxle, in addition to a 3-year/36,000-mile bumper-to-bumper New Vehicle Limited Warranty ("NVLW"). These warranties obligate GM to repair or replace defective powertrain components, including the 1.2-liter turbocharged three-cylinder engine, at no cost to the owner or lessee. Nonetheless, numerous Class Vehicle owners have experienced catastrophic engine failure both within and outside the applicable warranty periods. In many cases, GM and its authorized dealers

have denied coverage, attributed the Defect to "normal operation," or performed superficial repairs that fail to correct the underlying condition. As a result, consumers are left with vehicles that suffer recurring failures, diminished safety, and substantial out-of-pocket expenses for engine replacement and related damage.

8.      GM's authorized dealerships are replacing and repairing Engine Systems both within, and just outside, the applicable express warranty periods.

9.      The Engine System Defect is inherent in each Class Vehicle and was present at the time of sale.

10.      Discovery will show that, since 2022, if not earlier, Defendant has been aware the Class Vehicles' engines were prone to premature internal failure, including bearing and connecting-rod damage, oil leakage, loss of propulsion, and fire. Defendant knew that the Engine System Defect would cause the symptoms described above, including sudden loss of power, smoke, fluid discharge, and engine seizure.

11.      Moreover, many owners have reported that repeated engine-related repairs that did not resolve the condition, demonstrating that Defendant has not implemented a permanent fix. Defendant not only refused to disclose the problem to consumers, but also actively concealed, and continues to conceal, its knowledge concerning the Engine System Defect. Internal reports, warranty claim data, and dealership repair orders will confirm that GM has long been aware that the software and hardware solutions implemented thus far are inadequate, yet it continues to market and sell affected vehicles without disclosing the ongoing risk to consumers.

12.      In fact, discovery will show that the Engine System Defect is so severe that it has resulted in a multiple month backorder on the Engine which in turn has resulted in Class Vehicles remaining unrepaired and undriveable for extended periods of time.

13.      Defendant undertook affirmative measures to conceal engine failures and other malfunctions through, among other things, Technical Service Bulletins ("TSB") issued to authorized repair facilities only.

14.      Indeed, public records confirm that GM has issued multiple Technical Service Bulletins ("TSBs") and related internal communications acknowledging oil leakage, abnormal

knocking noises, and other symptoms consistent with the Engine System Defect. These documents demonstrate that GM was aware of recurring engine failures in Class Vehicles equipped with the 1.2-liter turbocharged three-cylinder engine well before Plaintiffs and Class Members purchased or leased their vehicles.

15. Publicly available TSBs include 20-NA-084, 23-NA-122, 23-NA-141, and 24-NA-021, each of which documents conditions tied to premature engine failure yet instructs dealers that such symptoms are "normal" or not warrantable. Although issued as early as 2020 for vehicles using the same 1.2-liter turbocharged three-cylinder engine, such bulletins apply directly to the Class Vehicles because the same engine design (RPO LIH/LBP) was carried forward into the 2024-present Buick Encore GX, Buick Envista, Chevrolet Trailblazer, and Chevrolet Trax, dating back to at least April 2020.

16. Defendant had superior and/or exclusive knowledge of material facts regarding the Engine System Defect due to its pre-production testing, design failure mode analysis, aggregate part sales, consumer complaints about the Defect to Defendant's dealers, who are their agents for vehicle repairs, customer complaints made directly to GM, dealer audits, aggregate warranty information, consumer complaints to and resulting notice from NHTSA, early consumer complaints on websites and internet forums, dealership repair orders, among other internal sources of information about the problem.

17. Despite widespread field reports describing catastrophic engine failure, GM has not implemented an effective repair that addresses the root cause of the Engine System Defect. Service guidance given to dealers has often characterized abnormal engine noises and oil leakage as "normal" and discouraged engine replacement, leaving consumers with vehicles that remain unsafe and unreliable.

18. The Engine System Defect is material because, *inter alia,* it poses a safety concern. As attested by Class Members in complaints to the National Highway Traffic Safety Administration ("NHTSA"), and other online forums, when the engine fails, the vehicle may abruptly lose propulsion and steering assist, emit smoke, discharge oil and coolant, and in some instances ignite under-hood components, thereby increasing the risk of collision and injury.

19.    Defendant's failure to disclose the Engine System Defect has caused Plaintiffs and putative class members to suffer Engine failure, diminished safety,  and/or incur costly repairs that have conferred an unjust substantial benefit upon Defendant.

20.    Discovery will show that, in an effort to conceal the Engine System Defect, Defendant instructed dealers to tell consumers their vehicles are "operating normally" or "operating as intended" when they are not, or to give excuses for sub-par performance. This is a common practice in the automotive industry and has occurred here in connection with the Engine System Defect. By denying the existence of a defect, manufacturers can play on the consumers' lack of technical expertise and avoid implementing potentially costly fixes for years, or at least until the vehicles are out of warranty. When remedial measures are taken, they are often through the issuance of service bulletins provided to dealers only that are narrowly crafted and underinclusive, as occurred here and set forth below.

21.    Had Defendant disclosed the Engine System Defect, and the inadequacy of the service bulletin remedies, Plaintiffs and Class Members would not have purchased and/or leased the Class Vehicles, would have paid less for them, or would have required Defendant to replace, or pay for the replacement of, the defective Engine System components with non-defective versions before their warranty periods expired.

## THE PARTIES

**Plaintiffs Samantha Cook and Donna Cook**

22.    Plaintiffs Samantha Cook and Donna Cook are California citizens residing in Long Beach, California.

23.    On or around August 8, 2023, Plaintiffs purchased a new 2024 Chevrolet Trax from Harbor Chevrolet, an authorized GM dealership in Long Beach, California.

24.    Plaintiffs purchased their vehicle primarily for personal, family, or household use.

25.    Passenger safety and reliability were important factors in Plaintiffs' decision to purchase their vehicle. Before making their purchase, Plaintiffs researched the Chevrolet Trax online, including on the dealer website. At the dealership, Plaintiffs also reviewed the vehicle's

Monroney Sticker or "window sticker," which listed official information about the vehicle. Plaintiffs also discussed the safety features of the vehicle with dealership personnel, who made no reference to the Engine System Defect.

26.     GM's omissions were material to Plaintiffs. Had GM disclosed its knowledge of the Engine System Defect before they purchased their vehicle, Plaintiffs would have seen and been aware of the disclosures. Furthermore, had they known of the Engine System Defect, Plaintiffs would not have purchased their vehicle.

27.     Shortly after purchase, Plaintiffs began experiencing Engine System problems. Specifically, on or around January 25, 2026, while Plaintiff Samantha Cook was driving on Amboy Road returning from Johnson Valley, California, the vehicle suddenly displayed a reduced engine power warning, followed shortly by loss of propulsion, loss of power steering, and failure of the accelerator and brake response. The vehicle emitted severe knocking consistent with connecting-rod damage.

28.     Plaintiff coasted into a dirt pull-off area. The vehicle was inoperable and stranded in the desert. A tow truck operator attempted to move the vehicle but could not due to violent rod knocking and internal mechanical failure.

29.     On or around January 25, 2026, with approximately 11,581 miles on the odometer, Plaintiffs brought their vehicle to Findlay Chevrolet Buick GMC in Bullhead City, Arizona, complaining sudden loss of propulsion, loss of power steering, and severe connecting-rod knocking as described above. The dealership informed Plaintiffs that the engine had suffered internal mechanical failure, including a broken connecting rod, and advised that the engine would require replacement or complete teardown for further inspection. Despite this repair attempt, the dealer has not yet replaced the engine in Plaintiffs' vehicle, and the vehicle remains in its possession and is not useable. In fact, Plaintiffs were informed by the dealership that there is a months-long backorder on the Engine and that it could not be replaced until a new Engine is available.

30.     Despite bringing their vehicle to a GM dealership, GM's authorized agent for repairs, Plaintiffs have not received a permanent repair under warranty, and their vehicle continues to exhibit the Engine System Defect.

31.     As a result of the Engine System Defect, Plaintiffs have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiffs will be unable to rely on the Class Vehicle's advertising or labeling in the future and so will not purchase or lease another Class Vehicle, although they would like to do so.

32.     At all times, Plaintiffs, like all Class Members, have driven their vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiff Casadie Zeletsky**

33.     Plaintiff Casadie Zeletsky is a New Hampshire citizen residing in Salem, New Hampshire.

34.     In or around August 2023, Plaintiff Zeletsky purchased a new 2024 Chevrolet Trax 1RS from MacMulkin Chevrolet, an authorized GM dealership in Nashua, New Hampshire.

35.     Plaintiff Zeletsky purchased her vehicle primarily for personal, family, or household use.

36.     Passenger safety and reliability were important factors in Plaintiff Zeletsky's decision to purchase her vehicle. Before making her purchase, Plaintiff Zeletsky researched the Chevrolet Trax online. At the dealership, Plaintiff Zeletsky also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Plaintiff also discussed the safety features of the vehicle with dealership personnel, who made no reference to the Engine System Defect.

37.     GM's omissions were material to Plaintiff Zeletsky. Had GM disclosed its knowledge of the Engine System Defect before she purchased her vehicle, Plaintiff Zeletsky would have seen and been aware of the disclosures. Furthermore, had she known of the Engine System Defect, Plaintiff would not have purchased her vehicle.

38. Shortly after purchase, Plaintiff Zeletsky began experiencing Engine System problems. Specifically, Plaintiff Zeletsky's "check engine" light on her dashboard began lighting up. She contacted MacMulkin Chevrolet at least two times about the "check engine" warning, but when she took her vehicle to the dealership the light was no longer on and the dealership told her nothing was wrong with the engine. Additionally, when her vehicle reached highway speeds, the entire vehicle would vibrate. When Plaintiff Zeletsky contacted MacMulkin Chevrolet about the vibration issue, she was told that that was just how the car was and there was nothing to be done about the issue.

39. Plaintiff Zeletsky's Engine System problems continued. On or around February 26, 2026, while driving on I-93 South in New Hampshire with approximately 74,815 miles on the vehicle, Plaintiff Zeletsky heard and felt something like a "pop" or "pressure release" from her vehicle, and smoke began blowing out from the hood of the vehicle onto her windshield. The vehicle immediately lost power while she was driving in the middle of the interstate and displayed a low engine power warning.

40. Plaintiff coasted to the shoulder of the interstate at or around mile marker 9.8 and exited her vehicle. She opened her hood and saw a fire in the engine area, as well as oil leaking to the ground on fire. Plaintiff Zeletsky, in a panic, called her father who then told her to call 911. Plaintiff Zeletsky called 911 and informed the operator that her vehicle was on fire. After removing some personal items from the vehicle, including items belonging to her infant daughter, she waited for emergency services further down the interstate away from the burning vehicle. Once emergency services arrived, they were able to extinguish the fire. Plaintiff Zeletsky then had her vehicle towed to Sunrise Auto in Everett, Massachusetts.

41. Plaintiff Zeletsky's insurance adjuster went to Sunrise Auto to view the vehicle and told Plaintiff to get her vehicle moved to Pride Chevrolet in Lynn, Massachusetts where it remained from approximately March 9, 2026 to March 19, 2026.

42. On March 18, 2026, Plaintiff Zeletsky called Pride Chevrolet to inquire about the status of her vehicle. Dealership personnel informed her that the engine would need to be replaced, along with several other components that were damaged in the fire, quoting her an

estimate of approximately $10,000 out-of-pocket for the repairs. The dealership offered no explanation as to what could have caused the fire, however Plaintiff Zeletsky's insurance adjuster told her that the dealership's service manager said "this has been happening with these cars."

43.     On March 19, 2026, Plaintiff Zeletsky had her vehicle moved back to Sunrise Auto.. Sunrise Auto replaced the engine with one that had approximately 30,000 miles on it, and Plaintiff Zeletsky retrieved her vehicle on or around March 27, 2026 and paid approximately $7,500.00 for the repair work

44.     As a result of the Engine System Defect, Plaintiff has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff will be unable to rely on the Class Vehicle's advertising or labeling in the future and so will not purchase or lease another Class Vehicle, although she would like to do so.

45.     At all times, Plaintiff Zeletsky, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiffs Joe and Diane Baucom**

46.     Plaintiffs Joe and Diane Baucom are Maine citizens residing in Trescott Township, Maine.

47.     In or around November 2024, Plaintiffs Joe and Diane Baucom purchased a new 2024 Chevrolet Trax 1RS from Pratt Chevrolet, an authorized GM dealership in Callais, Maine.

48.     The Baucoms purchased their vehicle primarily for personal, family, or household use.

49.     Passenger safety and reliability were important factors in the Baucoms' decision to purchase their vehicle. Before making their purchase, the Baucoms researched the Chevrolet Trax online. At the dealership, Joe and Diane Baucom also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Plaintiffs also discussed the safety features of the vehicle with dealership personnel, who espoused how reliable the vehicle was and made no reference to the Engine System Defect.

50. GM's omissions were material to Plaintiffs Joe and Diane Baucom. Had GM disclosed its knowledge of the Engine System Defect before they purchased their vehicle, Plaintiffs would have seen and been aware of the disclosures. Furthermore, had they known of the Engine System Defect, Plaintiffs would not have purchased their vehicle.

51. On or around January 10, 2026, Plaintiff Diane Baucom was driving to visit her mother on Route 6 in Maine, a mountain road, and with approximately 28,000 miles on the vehicle, the vehicle suddenly lost significant power, and all the lights came flashing on the dashboard. With barely any power, and with large semi-trucks barreling around her, Plaintiff Diane managed to pull over.

52. Plaintiff coasted to the shoulder of Route 6 and exited her vehicle. She was left stranded on the side of the road, while large logging trucks raced by, and called her husband, Plaintiff Joe Baucom, to help her. Plaintiff Joe Baucom drove out to meet her, then drove the broken-down Vehicle approximately six miles to the assisted living facility where Plaintiff Diane Baucom's mother resides, while the vehicle was at a significant loss of power and unable to reach above 30 miles per hour.

53. Joe Baucom used his Chevy phone application to request a tow, and the Vehicle was towed to a nearby Chevy dealership called Katahdin Motors in Millinocket, Maine.

54. Katahdin Motors informed Plaintiff that a cylinder had blown and lost compression, and the entire engine needed to be replaced.

55. Plaintiffs' Vehicle remained at Katahdin motors from January 12, 2026 to March 3, 2026, approximately 40 days.

56. While the engine was replaced on warranty, the replaced engine contains the same Defect, and thus the repair does not actually fix the Vehicle and the Baucoms live in fear that the engine will fail again.

57. As a result of the Engine System Defect, Plaintiffs have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiffs will be unable to rely on the Class Vehicle's advertising

or labeling in the future and so will not purchase or lease another Class Vehicle, although they would like to do so.

58.    At all times, Plaintiffs Baucom, like all Class Members, have driven their vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiff Kristi Smith**

59.    Plaintiff Kristi Smith is a Missouri citizen residing in Grain Valley, Missouri.

60.    On or around October 15, 2025, Plaintiff Smith purchased a new 2025 Chevrolet Trax from Molle Chevrolet, an authorized GM dealership in Blue Springs, Missouri.

61.    Plaintiff Smith purchased her vehicle primarily for personal, family, or household use.

62.    Passenger safety and reliability were important factors in Plaintiff Smith's decision to purchase her vehicle. Before making her purchase, Plaintiff Smith researched the Chevrolet Trax online. At the dealership, Plaintiff Smith also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Plaintiff also discussed the safety features of the vehicle with dealership personnel, who made no reference to the Engine System Defect. Had GM disclosed its knowledge of the Engine System Defect, Plaintiff Smith would have been aware of the disclosures and would not have purchased her vehicle.

63.    In or around February 2026, with about 5,000 miles on the vehicle, Plaintiff Smith's vehicle experienced excessive oil consumption issues, resulting in Plaintiff Smith adding one quart of oil every week to sustain the engine.

64.    On or around March 9, 2026, Plaintiff Smith was driving home from work on the interstate, and with about 6,000 miles on the vehicle, the vehicle made a singular loud knocking sound, then multiple loud noises, followed immediately by a complete loss of power. With no engine power, Plaintiff Smith was able to coast the vehicle to the side of the road out of traffic.

65.    Plaintiff Smith had the vehicle towed to Molle Chevrolet on that same day, where it remains as of the date of filing, due to back-ordered parts.

66.     As a result of the Engine System Defect, Plaintiff has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff will be unable to rely on the Class Vehicle's advertising or labeling in the future and so will not purchase or lease another Class Vehicle, although she would like to do so.

67.     At all times, Plaintiff Smith, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**Defendant**

68.     Defendant General Motors, LLC ("GM") is a limited liability company organized and in existence under the laws of the State of Delaware, with its principal place of business located at 300 Renaissance Center, Detroit, Michigan 48243. GM is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in California and throughout the United States of America. GM also drafts and distributes technical materials, including service manuals, technical service bulletins ("TSBs"), and recall notices, intended to be used by authorized dealerships in the service and repair of GM-branded vehicles.

69.     In order to sell vehicles to the general public, GM authorizes dealerships to sell GM-branded vehicles to consumers such as Plaintiffs. In return for the exclusive right to sell new GM vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties GM provides directly to consumers. These contracts give GM a significant amount of control over the actions of the dealerships, including the sale and marketing of vehicles and parts. All service and repairs at an authorized dealership are completed according to GM's explicit instructions, issued through service manuals, TSBs, and other documents. Per the agreements between GM and its authorized dealers, consumers such as Plaintiffs can receive services under GM's issued warranties at dealer locations that are convenient to them. GM has a nationwide dealership network and operates offices and facilities throughout the United States. GM distributes parts and vehicles, which are then sold through its

network of dealerships. Money received from the purchase of a GM vehicle from a dealership flows from the dealer to GM.

70.    Defendant developed and disseminated the marketing materials to which Plaintiffs and the Class were exposed, including owner's manuals, informational brochures, warranty booklets, and information included in maintenance recommendations and/or schedules for the Class Vehicles, and other promotional materials relating to the Class Vehicles, all of which fail to disclose the Defect.

71.    Defendant designed, manufactured, constructed, assembled, marketed, distributed, sold, and warranted the Class Vehicles, including Plaintiffs' vehicle.

**JURISDICTION**

72.    This is a class action.

73.    Members of the proposed Class are citizens of states different from the home states of Defendant.

74.    There are at least 100 members in the proposed class, and the aggregate claims of individual Class Members exceed $5,000,000.00 in value, exclusive of interest and costs.

75.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d) because minimal diversity exists, the proposed class exceeds 100 members, and the amount in controversy exceeds $5 million.

76.    This Court has personal jurisdiction over Defendant General Motors LLC because GM is a Delaware limited liability company organized under the laws of the State of Delaware and is therefore "at home" in Delaware for purposes of general jurisdiction.

**VENUE**

77.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant General Motors LLC is a Delaware limited liability company and is deemed to reside in this District for venue purposes. As GM resides in this District within the meaning of § 1391(c)(2), venue is proper regardless of where Plaintiffs reside or where their injuries occurred.

**FACTUAL ALLEGATIONS**

78.     Defendant designed, manufactured, distributed, marketed, sold, and/or leased the Class Vehicles. Defendant sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in California and nationwide. Defendant warrants and services the Class Vehicles through their nationwide network of authorized dealers and service providers. Defendant exercises control over the development, dissemination, and implementation of technical service bulletins, recall notices, and repair procedures related to the Engine System in the Class Vehicles.

79.     The Engine System in the Class Vehicles is a 1.2-liter turbocharged inline three-cylinder gasoline engine (RPO LIH/LBP) that shares common casting, lubrication, and rotating-assembly architecture across models. The design employs pressurized lubrication of crankshaft and connecting-rod bearings, oil-to-coolant heat exchange, and block castings with threaded fastener bores that, when porous, can permit oil or coolant migration.

80.     In the Class Vehicles, this Engine architecture has manifested in abnormal knocking, rapid loss of power, and connecting-rod ejection through the engine block under ordinary driving, frequently accompanied by oil and coolant discharge and engine-compartment smoke or fire. Owner have reported sudden engine shutdowns, oil leakage, and internal damage consistent with bearing distress and block porosity, requiring engine replacement or extensive repair. Owners have further reported abrupt loss of propulsion, smoke, and fluid leakage consistent with connecting-rod failure and block breach, creating an acute safety hazard at highway speeds. Field reports describe a progression from knocking to immediate loss of power, followed by oil and coolant discharging onto hot components and visible smoke; several reports include under-hood flame and roadside disablement despite prior service visits.

81.     The common Engine architecture across the Class Vehicles includes shared casting designs, lubrication passages, and rotating assemblies. TSBs acknowledge phenomena tied to this architecture, including early wear-in debris within the oil system, abnormal engine noise characterized as "deep thudding" or knocking, oil consumption and smoke associated with cam/cover ventilation faults, and oil leakage from block bolt-hole porosity and sealing interfaces.

14

These conditions increase mechanical and thermal loads on bearings and rods and can culminate in catastrophic internal failure. Figure 1 below depicts examples of "connecting rod or crankshaft main bearing damage that would require an engine assembly replacement along with the oil cooler, oil cooler lines, oil tank and turbocharger if equipped" as displayed in GM's bulletin no. 22-NA-074 from January 2025.



Fig. 1

82.    Figure 2 below depicts visible damage on the crankshaft/crankcase, as depicted in GM's bulletin no. 18-NA-073 from August 2024.



Fig. 2

83.    Figure 3 below depicts the Class Vehicles' engine assembly, as shown in TSB 24-NA-021 from August 2024.



Fig. 3

84.    Discovery will show that all Class Vehicles utilize the same underlying engine design family, components, and lubrication pathways that render the Defect common across models regardless of trim level.

85.     GM has issued multiple engine-related TSBs addressing abnormal knocking noises, oil leakage caused by block bolt-hole porosity, and seepage near the oil pan and timing cover. These communications characterize certain symptoms as "normal" and often discourage engine replacement, despite recurrent field failures.

86.     The TSB guidance provided to dealers has not corrected the underlying Engine System Defect. Owners continue to experience catastrophic internal failures, sudden loss of propulsion, oil and coolant discharge, and, in some cases, fire, despite prior service visits.

87.     Despite these continued failures, GM has not implemented a permanent engine repair that addresses the root cause. Instead, affected consumers have been left with defective vehicles that remain unsafe to operate. GM's failure to implement an effective fix underscores its ongoing unwillingness to fully address the Engine System Defect, placing consumers at continued risk of safety hazards.

88.     Discovery will confirm that the Engine System Defect in all Class Vehicles is caused by improperly designed and/or manufactured internal components and lubrication pathways, including block porosity and oil-system faults. Manufacturer communications, TSBs, and field reports identify oil leakage from threaded fastener bores in the block, abnormal noise events treated as "normal," and oil consumption and smoke associated with ventilation and cover assemblies; these conditions promote bearing distress, oil starvation, and connecting-rod failure.

89.     The Engine System Defect is inherent in, and the same for, all Class Vehicles. Regardless of TSB-mandated repairs and procedures, the same underlying issues persist, making it impossible for GM to effectively repair affected vehicles without a substantial redesign of the Engine and associated components.

90.     In fact, discovery will show that the Engine System Defect is so severe that it has resulted in a multiple month backorder on the Engine which in turn has resulted in Class Vehicles remaining unrepaired and undriveable for extended periods of time.

91.     Discovery will show that GM was aware of material facts regarding the Engine System Defect but failed to disclose them to consumers. Internal documents, dealership service reports, and consumer complaints submitted to regulatory agencies will confirm that GM had

knowledge of the Defect well before Plaintiffs' and Class Members' purchases and/or leases. As a result of this failure, Plaintiffs and Class Members have been damaged.

**The Engine System Defect Poses an Unreasonable Safety Hazard.**

92.     The Engine System Defect poses an unreasonable safety hazard. The Defect causes sudden loss of propulsion and steering assist at highway speeds and may result in smoke or fire, creating an immediate risk of collision and injury.

93.     Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

94.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related. *Id.* Thus, GM knew or should have known of the many complaints about the Engine System Defect logged by NHTSA Office of Defects Investigation (ODI). The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, GM to the Engine System Defect.

**GM Has Knowledge of the Engine System Defect Through Consumer Complaints.**

95.     With respect solely to the Class Vehicles, the following are but a few examples of the many complaints concerning the Engine System Defect which are available through NHTSA's website, www.safercar.gov. Many of the complaints reveal that GM, through its network of dealers and repair technicians, has been made aware of the Engine System Defect, both prior and subsequent to the issuance of its many. In addition, the complaints indicate that despite having knowledge of the Engine System Defect and even armed with knowledge of the exact vehicles affected, GM often refused to diagnose the Defect or otherwise attempt to repair it while Class Vehicles were still under warranty.

*2024 Chevrolet Trax*

November 29, 2024 **NHTSA ID NUMBER: 11627945**
**Components: ELECTRICAL SYSTEM, VEHICLE SPEED CONTROL, ENGINE**
**NHTSA ID Number:** 11627945
**Incident Date** November 19, 2024
**Consumer Location** EASLEY, SC
**Vehicle Identification Number** KL77LHE29RC****
**Summary of Complaint**
**CrashNo**
**FireYes**
**Injuries0**
**Deaths0**
On Tues 11/19/24, my son left home about 10 mins prior headed back to school in our 2024 Chevy Trax purchased in 5/2023. On his way to school, he and his friend heard a loud pop sound, followed by all the lights on the instrument panel flickering like crazy, smoke coming from under the hood, and then the car slowing to a stop, still in the road. Luckily they were able to get out because all the doors, except the driver door, locked including the trunk. The smoke got worse until it caught on fire. Good Samaritans stopped to help my 17 yo son and his friend and there was an off duty responder that turned around to put out the fire with the extinguisher he had on him, ahead of the fire department arriving on scene. This could have been very detrimental and had a very different outcome and GM/Chevy need to make sure this doesn't happen to another family. This car was serviced and had very low mileage of less than 12k in 1.5years.

September 16, 2024 **NHTSA ID NUMBER: 11614827**
**Components: ENGINE**
**NHTSA ID Number:** 11614827
**Incident Date** September 10, 2024
**Consumer Location** CINCINNATI, OH
**Vehicle Identification Number** KL77LJE28RC****
**Summary of Complaint**
**CrashNo**
**FireNo**
**Injuries0**
**Deaths0**
While driving at approximately 60mph, the engine suffered a catastrophic failure. According to the licensed Chevy service repair shop, the engine "threw a rod that resulted in a hole in the engine block." The car immediately lost power while driving on the highway with my wife and young child. The result of this scenario was lucky enough to avoid serious injury.

August 21, 2024 **NHTSA ID NUMBER: 11609953**
**Components: ENGINE**
**NHTSA ID Number:** 11609953
**Incident Date** August 18, 2024
**Consumer Location** AVON, OH

19

**Vehicle Identification Number** KL77LJE2XRC****
**Summary of Complaint**
**CrashNo**
**FireNo**
**Injuries0**
**Deaths0**
I was driving on [XXX]. The engine lights came on and the message said to basically shut the car off. I was going 70 MPH. I slowed down and pulled over. I heard a loud bang as the car started smoking. Oil and coolant leaked out over the road, there were pieces of a frayed belts and a broken bolt near the car. I had it towed 50 miles to the dealer (Serpentini Chevy) that i bought the car from. They told me that the rod blew and that the engine is shot. They are searching for a new engine and cant guarantee that it wont happen again. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

July 9, 2024 **NHTSA ID NUMBER: 11600423**
**Components: ENGINE**
**NHTSA ID Number:** 11600423
**Incident Date** July 8, 2024
**Consumer Location** SANFORD, FL
**Vehicle Identification Number** KL77LHE25RC****
**Summary of Complaint**
**CrashNo**
**FireNo**
**Injuries0**
**Deaths0**
I was driving on a busy expressway. My Trax began to lose power then there was a loud explosive sound and a cloud of black smoke. The Trax continued to lose power as I navigated across several lanes of traffic to the shoulder. There was oil everywhere. I was stranded with my dog in 100° heat. The Trax has been towed to the dealer and I am waiting on the official diagnosis.

May 26, 2024 **NHTSA ID NUMBER: 11590823**
**Components: ENGINE**
**NHTSA ID Number:** 11590823
**Incident Date** May 21, 2024
**Consumer Location** ROSHARON, TX
**Vehicle Identification Number** KL77LJE23RC****
**Summary of Complaint**
**CrashNo**
**FireNo**
**Injuries0**
**Deaths0**
What component or system failed or malfunctioned, and is it available for inspection upon request? The Engine system including power train and electrical harnest. How was your safety or the safety of others put at risk? I was driving the engine light illuminated after i smelt burning. i immediately pulled over and called the dealership. The vehicle is brand new with less than 10 miles on the odometer.

Has the problem been reproduced or confirmed by a dealer or independent service center? Yes The dealership service department states Chevy is aware of the problem but has not issued a recall. Has the vehicle or component been inspected by the manufacturer, police, insurance representatives or others?Yes by the Chevrolet company Were there any warning lamps, messages or other symptoms of the problem prior to the failure, and when did they first appear? the vehicle has less than 10 miles on the odometer. after possession of the vehicle while driving the engine light came on. i immediately notified the dealer and had car towed dor repair on 5/22. The car remains in the shop with no estimated date of repair.

April 19, 2024 **NHTSA ID NUMBER: 11583986**
**Components: ENGINE**
**NHTSA ID Number:** 11583986
**Incident Date** April 16, 2024
**Consumer Location** PEARISBURG, VA
**Vehicle Identification Number** KL77LJE21RC****
**Summary of Complaint**
**CrashNo**
**FireNo**
**Injuries0**
**Deaths0**
Driving down the highway at a normal speed and the engine made a loud noise and then quit. We took it to a dealership and they said the engine is blown. They said there was a huge hole in the side of the engine.

April 16, 2024 **NHTSA ID NUMBER: 11583348**
**Components: ENGINE**
**NHTSA ID Number:** 11583348
**Incident Date** April 13, 2024
**Consumer Location** ENID, OK
**Vehicle Identification Number** KL77LFE2XRC****
**Summary of Complaint**
**CrashNo**
**FireNo**
**Injuries0**
**Deaths0**
I was driving the car on a highway and there was a small muffled boom sound under the hood. The "low oil pressure light" came on simultaneous to the sound and the car suddenly lost power. I managed to put on brakes and pull to the shoulder of a very busy highway with semi trucks passing closely by. I was luckily able to get out of traffic because I happened to be in the right lane. The vehicle was towed to a GM dealer where it remains. The service mgr stated it had a sudden catastrophic engine failure and there was a huge hole in the side of the engine block. They have no other updates for me and will not discuss it at this time. I'm not aware of anyone else examining the vehicle.

February 23, 2024 **NHTSA ID NUMBER: 11573649**
**Components: ENGINE**

**NHTSA ID Number:** 11573649
**Incident Date** January 30, 2024
**Consumer Location** LAS VEGAS, NV
**Vehicle Identification Number** KL77LFE20RC****
**Summary of Complaint**
**CrashNo**
**FireYes**
**Injuries0**
**Deaths0**
The contact owned a 2024 Chevrolet Trax. The contact stated that while her son was driving at approximately 45 MPH, he observed smoke emanating from the engine compartment. The contact stated that as her son attempted to steer the vehicle off of the highway, the vehicle caught fire. The fire department extinguished the fire. It is unknown if there was a police report taken at that time. The vehicle was towed to a tow yard where it was diagnosed as totaled. The manufacturer was not notified of the failure. The failure mileage was 6,455.

## _2025 Chevrolet Trax_

November 21, 2024 **NHTSA ID NUMBER: 11626571**
**Components: ELECTRICAL SYSTEM, STRUCTURE, ENGINE**
**NHTSA ID Number:** 11626571
**Incident Date** October 22, 2024
**Consumer Location** OTEGO, NY
**Vehicle Identification Number** KL77LHEP0SC****
**Summary of Complaint**
**CrashNo**
**FireYes**
**Injuries0**
**Deaths0**
On October 22, 2025 I drove 10 miles from my home. I turned off and parked the vehicle at approx. 8:58 AM. Within 2 minutes I notices quite a bit of smoke coming from under the hood. I called the fire department and within 10 minutes the entire front of the car was on fire. The vehicle from front bumper through the dashboard was completely destroyed. There were no warning lights on. I purchased the vehicle on June 5th 2024. My INsurance co. did the appraisal and deemed it a total loss of course. The Dealership AND General Motors refuse to do anything to investigate. I have documentation of all calls. General Motors told me they do not put anything in writing.

December 3, 2024 **NHTSA ID NUMBER: 11628543**
**Components: FUEL/PROPULSION SYSTEM**
**NHTSA ID Number:** 11628543
**Incident Date** November 22, 2024
**Consumer Location** YOUNGSTOWN, OH
**Vehicle Identification Number** KL77LJEP6SC****
**Summary of Complaint**
**CrashNo**

**FireNo**
**Injuries0**
**Deaths0**
Fuel injection system failure. Dealer confirmed code being seen was related to fuel injectors. Check engine light illuminated on Nov. 22, 2024, which is less than 2 weeks into my ownership of the vehicle. Vehicle is still in the shop for repairs.

### *2024 Chevrolet Trailblazer*

JANUARY 16, 2026NHTSA CAMPAIGN NUMBER: 11711444
COMPONENT: ENGINE
**NHTSA ID Number:** 11711444

**Incident Date:** January 12, 2026

**Consumer Location:** ASHLAND, VA

**Vehicle Identification Number:** KL79MPSL0RB******

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**
My 2024 trailblazer It's engine light came on about a month ago. I took it to a local dealership and they said it was caused by CCND. Diagnosed code P0128 in pass/fail status. They test drove it to get light to come on and it was unable to duplicate it. They cleared the codes. A month later it came back on. I took it to my dealership and they said they have to take the entire front end off to replace the engine coolant bypass valve. They said that the electronic component was going bad. This car isn't even 2 yrs old. This should not be happening.

MAY 25, 2025NHTSA CAMPAIGN NUMBER: 11662994
COMPONENT: ENGINE
**NHTSA ID Number:** 11662994

**Incident Date:** May 23, 2025

**Consumer Location:** CITRUS SPRINGS, FL

**Vehicle Identification Number:** KL79MVSL6RB******

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**
My 2024 Chevrolet Trailblazer ACTIV with 26,000 experienced complete engine failure while driving. Palm Chevrolet said my Trailblazer had "internal engine failure" and needs to be replaced.

DECEMBER 5, 2024NHTSA CAMPAIGN NUMBER: 11629011
COMPONENT: SERVICE BRAKES, HYDRAULIC, POWER TRAIN, ENGINE
**NHTSA ID Number:** 11629011

23

**Incident Date:** September 5, 2024

**Consumer Location:** CONLEY, GA

**Vehicle Identification Number:** KL79MPSL0RB******

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**

The contact owns a 2024 Chevrolet Trailblazer. The contact stated while driving at an undisclosed speed, the vehicle failed to accelerate as intended. In addition, the contact stated that when the parking brake was released, the vehicle jerked. The contact stated when the accelerator pedal was depressed, the vehicle jerked. The contact stated that whenever the brake pedal was depressed, the vehicle failed to stop as intended. The vehicle was not diagnosed or repaired. The vehicle was scheduled for a diagnostic test within several days. In addition, the contact stated that the engine was recently replaced due to an oil leak. The vehicle had been serviced by the dealer several times due to the persistent failures. The manufacturer was not made aware of the failure. The failure mileage was approximately 10,000.

OCTOBER 22, 2024NHTSA CAMPAIGN NUMBER: 11621360
COMPONENT: POWER TRAIN, ELECTRICAL SYSTEM, ENGINE
**NHTSA ID Number:** 11621360

**Incident Date:** October 9, 2024

**Consumer Location:** STAFFORD, VA

**Vehicle Identification Number:** KL79MUSL1RB******

**Summary of Complaint**

**Crash:YesFire:NoInjuries:0Deaths:0**

My daughter was stopped at a stoplight and the auto-stop engaged. The light turned green and she began to accelerate when all of the error lights on the dash lit up, then the dash info system and infotainment system went out followed by the engine turning off and not restarting. While all of this happened, the vehicle behind me struck my daughter's car. Luckily it was at a low rate of speed and no one was injured. I took the car to the dealer and after nearly a week of testing they found nothing wrong and found no error codes in the system. They ere not able to replicate the problem. However, once we got the vehicle back a similar instance happed again, except just the dash info system and infotainment system went out and the car was still drivable. Once restarted the electronics came back on as normal. It has not happened again at this point. Had the first incident happened at a higher rate of speed a severe injury or fatality could have occurred.

OCTOBER 9, 2024NHTSA CAMPAIGN NUMBER: 11619009

COMPONENT: ELECTRICAL SYSTEM, ENGINE

**NHTSA ID Number:** 11619009

**Incident Date:** October 5, 2024

**Consumer Location:** SIMI VALLEY, CA

**Vehicle Identification Number:** KL79MRSL0RB******

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**

I was driving my 1 week old vehicle, on a city street, foot still on the gas, and the vehicle COMPLETELY shut down; no power at all. it wasn't the auto start/stop technology, but rather a complete power down. no lights, no hazard lights, no dash, nothing worked. The car came to an abrupt stop. The gear shift could not be moved into neutral, nothing. Luckily I was on a city street with not a lot of traffic. If I had been on a highway it could have caused a SERIOUS accident; if I had been driving across railroad tracks and it stops - very dangerous. I was able to contact AAA, and after a "jump", it started. However, because of my proximity to the highway, I opted to have it towed to the dealer where I bought it....they ran service on it and can find nothing wrong with it...as you can imagine, I am nervous to drive on the highway (which I do 5 days a week normally)...

SEPTEMBER 19, 2024NHTSA CAMPAIGN NUMBER: 11615466
COMPONENT: ENGINE

**NHTSA ID Number:** 11615466

**Incident Date:** August 10, 2024

**Consumer Location:** SPOKANE, WA

**Vehicle Identification Number:** KL79MSSL3RB******

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**

While in traffic, brand new 2024 Chevy Trailblazer vehicle has stalled on us a few times now and doesn't start right back up. It appears to happen when the vehicle is going from the fuel saving "start-stop mode" and we've found ourselves in a precarious situtations in traffic. I can foresee this happening at a very dangerous time causing a bad wreck. We just dropped the vehicle off with the dealer as we've had other issues with safety deterrent system going off for no reason and other pop ups on the instrument panel. However, the stalling in the middle of traffic is my worst concern.

APRIL 9, 2024NHTSA CAMPAIGN NUMBER: 11582007
COMPONENT: ENGINE
**NHTSA ID Number:** 11582007

**Incident Date:** April 6, 2024

**Consumer Location:** TCHULA, MS

**Vehicle Identification Number:** KL79MTSL1RB******

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**
The contact owns a 2024 Chevrolet Trailblazer. The contact stated that when the vehicle was started, the check engine warning light illuminated. The contact stated that smoke was coming from under the hood. Additionally, there was smoke coming through the interior vents. The vehicle was turned off however, the fan continued running. The vehicle was not diagnosed or repaired by an independent mechanic or the dealer. The manufacturer was not made aware of the failure. The failure mileage was approximately 400.

### *2025 Chevrolet Trailblazer*

MAY 11, 2025NHTSA CAMPAIGN NUMBER: 11660226
COMPONENT: POWER TRAIN, ELECTRICAL SYSTEM, ENGINE
**NHTSA ID Number:** 11660226

**Incident Date:** May 8, 2025

**Consumer Location:** SANDUSKY, OH

**Vehicle Identification Number:** KL79MPSP1SB******

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**
While driving the car stalled and eventually stopped running. The battery was still on, but there was no power to the engine. The car needed to be pushed out of the road and towed to the dealership for work.

### *2024 Buick Envista*

JANUARY 16, 2026NHTSA CAMPAIGN NUMBER: 11711372
COMPONENT: ELECTRICAL SYSTEM, ENGINE
**NHTSA ID Number:** 11711372

**Incident Date:** July 16, 2025

**Consumer Location:** CLARKSVILLE, TN

**Vehicle Identification Number:** KL47LAE29RB******

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**
The contact owns a 2024 Buick Envista. The contact stated that while driving at an undisclosed speed, the accelerator pedal was depressed,

and the contact felt a hard kick when the vehicle accelerated. The instrument cluster was blank. No warning lights were illuminated. Recently, while attempting to start the vehicle, the vehicle failed to start. The vehicle was not diagnosed or repaired by an independent mechanic or dealer. The dealer was made aware of the failure. The contact was informed that there were no open recalls associated with the VIN. The dealer requested that the contact pay for a diagnostic test. The contact referenced an unknown recall with a similar failure; however, the VIN was not under recall. The manufacturer was made aware of the failure but did not assist. The contact was informed that there were no open recalls on the VIN and that the vehicle was over the warranty mileage limitation. The contact was advised to contact the NHTSA Hotline to report the failure. The failure mileage was approximately 78,000.

DECEMBER 16, 2025NHTSA CAMPAIGN NUMBER: 11705232
COMPONENT: POWER TRAIN, STRUCTURE, ENGINE
**NHTSA ID Number:** 11705232

**Incident Date:** December 13, 2025

**Consumer Location:** GRAIN VALLEY, MO

**Vehicle Identification Number:** KL47LAE26RB******

**Summary of Complaint**

**Crash:NoFire:YesInjuries:1Deaths:0**

I filed and submitted my paragraph yesterday and have not heard a word. My son was in the back seat when it happened and he is extremely traumatized in getting back into a vehicle. My car was purchased in 2023 and it is a 2024 and is non drivable due to the engine explosion while driving in 14 degree weather on a two lane high way with my 6 and 7 year old in the back seat. My engine exploded and I no longer have my brand new car I was once so happy about. I hope this is reviewed and someone takes this seriously. I didnt have my brand new car for even 2 years and now I am just out of an option. My car is at the dealer ship and im praying I get good will out of this. I cpuld have been hit on the high way, traffic on coming while I had to merge off the highway as lastly as I could when I felt the explosion.

DECEMBER 14, 2025NHTSA CAMPAIGN NUMBER: 11704950
COMPONENT: ENGINE
**NHTSA ID Number:** 11704950

**Incident Date:** December 13, 2025

**Consumer Location:** GRAIN VALLEY, MO

**Vehicle Identification Number:** KL47LAE26RB******

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**

On December 3rd I contacted roberts-Robertson Chevrolet in Excelsior springs where I purchased my brand new 2024 buick envista. I told them my engine light is on, we scheduled service for 4 days later, the engine light shut off, i contacted them on the 13th telling them it is back on and now i am concerned if it is safe, while speaking to the representative will not share her name, until I am contacted, the service representative, I asked her yestersay at 1 pm cst over the phone if I was safe to be driving my kids to places with the engine light back on or should we be worried. She exact words stated your safe to keep driving, she said if anything. It might not start right away after driving and turning it off. But thats the most it will do. Not even two hours later, im driving my car and its 14 degrees, the car shakes, and I get an emergency shut off immediately nowessage on the screen. As soon as I got pulled over, the place it happened, all my oil just rapidly leaked out. I was told by my someone who works there to light a fire to my car so if the dealership doesnt stand behind it. At least id have an insurance claim. I clearly did not listen to that illegal advice. I am beyond upset. My kids are scared to death when it comes to getting back in the car. I had to pay 200 dollars to get it towed. And now im car less. It is our only car. I am stuck in a situation right before the holidays and I feel [XXX]. I feel complete dealership neglect when it comes to her reassuring my car was okay to drive when she didnt know what the safety risk was. My name is [XXX], I havent had the car for even two years. And its at 6 1 or 62 thousand miles. Im praying for good will or that they are able to fix this and allow me a rental car. I have been stressed to the max. I've spoke to 8005217300 the company who towed us and they told me some [XXX]. I just feel like this is a major safety and major concern issue. My car is garage parked. There was no sign leaks. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

OCTOBER 14, 2025NHTSA CAMPAIGN NUMBER: 11693273
COMPONENT: ENGINE AND ENGINE COOLING, FUEL SYSTEM, GASOLINE, ENGINE

**NHTSA ID Number:** 11693273

**Incident Date:** August 14, 2025

**Consumer Location:** NEW ORLEANS, LA

**Vehicle Identification Number:** KL47LAE21RB******

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**

28

The contact owns a 2024 Buick Envista. The contact stated that while driving at an undisclosed speed, the engine seized. The contact allowed the vehicle to sit for about an hour. The contact stated that while attempting to restart the vehicle, the vehicle started with the check engine warning light illuminated. In addition, the contact stated that while driving, the low-power warning light illuminated. In addition, the contact stated that after the vehicle was turned off and had sat for approximately an hour, the warning lights were no longer illuminated. The vehicle was taken to an Auto Zone, where the vehicle was diagnosed with an Oxygen sensor failure, a failed camshaft, and a failed purge valve pump. The vehicle was then taken to an independent mechanic, where the vehicle was repaired; however, the failure reoccurred. The dealer was made aware of the failure; however, the contact was informed that there were no early appointments available. The manufacturer was not made aware of the failure. The failure mileage was approximately 9,500.

MAY 14, 2025NHTSA CAMPAIGN NUMBER: 11661005
COMPONENT: ELECTRICAL SYSTEM, ENGINE
**NHTSA ID Number:** 11661005

**Incident Date:** May 8, 2025

**Consumer Location:** TAKOMA PARK, MD

**Vehicle Identification Number:** KL47LCE2XRB******

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**
The contact owns a 2024 Buick Envista. The contact stated that while at a stoplight, the vehicle shut off unintendedly. Additionally, while driving at an undisclosed speed and accelerating, the vehicle stalled. The contact stated that the instrument cluster screen was blank. There were no warning lights illuminated. The vehicle was towed to the local dealer, and the contact was informed that there were no trouble codes retrieved. The vehicle was not diagnosed or repaired. The manufacturer was contacted and suggested to the contact that the vehicle be traded. The failure mileage was approximately 7,000.

***2025 Buick Envista***

SEPTEMBER 16, 2025NHTSA CAMPAIGN NUMBER: 11687514
COMPONENT: ELECTRICAL SYSTEM, SERVICE BRAKES, ENGINE
**NHTSA ID Number:** 11687514

**Incident Date:** March 16, 2025

**Consumer Location:** WAUWATOSA, WI

**Vehicle Identification Number:** N/A

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**

The contact owns a 2025 Buick Envista. The contact stated that the check engine warning light was illuminated. While driving at an undisclosed speed and depressing the brake pedal, the vehicle jerked abnormally before coming to a complete stop. The failure also occurred while attempting to accelerate after stopping at a stop light or a stop sign. The were abnormal grinding sounds intermittently coming from the vehicle while driving at various speeds. The infotainment center also overheated and blacked out intermittently. The vehicle was taken to the dealer, who diagnosed that the sensor was moist after the vehicle had been on the lot for a while. The vehicle was not repaired. The failures persisted. The manufacturer was not informed of the failure. The failure mileage was approximately 700. The VIN was not available.

APRIL 29, 2025NHTSA CAMPAIGN NUMBER: 11657551
COMPONENT: ENGINE
**NHTSA ID Number:** 11657551

**Incident Date:** March 26, 2025

**Consumer Location:** MONTEBELLO, CA

**Vehicle Identification Number:** KL47LAEP1SB******

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**

The contact owns a 2025 Buick Envista. The contact stated that while driving at an undisclosed speed downhill, the vehicle started to shake abnormally. The contact stated that the check engine warning light was illuminated. The local dealer was contacted, but the vehicle was not diagnosed or repaired. The contact stated that the vehicle remained with the local dealer. The manufacturer was not made aware of the failure. The failure mileage was approximately 400.

### *2024 Buick Encore*

NOVEMBER 20, 2025NHTSA CAMPAIGN NUMBER: 11700570
COMPONENT: ENGINE, FUEL/PROPULSION SYSTEM
**NHTSA ID Number:** 11700570

**Incident Date:** April 10, 2025

**Consumer Location:** MULDROW, OK

**Vehicle Identification Number:** KL4AMBSL6RB******

**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**

Vehicle was started and started misfiring and then shut off, no check engine lights came on. Tried to restart the car and it continued to misfire but eventually stopped. Car also misfires sometimes after refueling. Car was taken to dealership to be looked at and there were no findings of any issues, they suggested it was bad gas.

96.     Similarly, complaints posted by consumers in internet forums demonstrate that the Defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate GM's awareness of the problems with the Engine System and how potentially dangerous the Defect is for consumers.

97.     GM also monitors third-party consumer websites, online forums, social-media groups, and public discussion boards where owners report vehicle problems. Automotive manufacturers, including GM, routinely track such publicly available complaint data as part of their quality-control, warranty-trend, and product-safety monitoring practices. Accordingly, GM knew or should have known of the widespread engine failures reported by owners on these platforms well before Plaintiffs purchased their vehicles. The following are a sample of consumer complaints (spelling and grammar mistakes remain as found in the original):

98.     For example, on ChevyTraxForum.com,[1] a third-party forum, a consumer who purchased a 2025 Trax reported that after only "a week and a half" the vehicle "started sputtering… like it was going to die," and displayed warnings including "service ESC," "engine power reduced," and "steering assist is reduced drive with care." The dealer kept the car for "almost 2 weeks," replaced the fuel injectors, returned it, and within "not even 2 days… it had the same issues." After an additional three weeks, the dealer informed the owner "they need to replace the entire engine." *(Post dated Nov. 18, 2024.)*

99.     On the same forum, another owner wrote that their 2025 Trax, leased in December, required service in January because "the fuel injectors and fuel rails needed to be replaced," and

_____

[1] 2025 Chevy Trax – Major Issues, *TraxForum.com* (discussion thread), https://www.traxforum.com/threads/2025-chevy-trax-major-issues.10697/ (last visited Feb. 25, 2026).

that by March they were returning to the dealership again due to "an emission system issue," expressing concern that they "don't want to have to deal with bringing it in for service every couple of months." *(Post dated Mar. 11, 2025.)*

100.    Another consumer reported that after purchasing a 2025 Trax on May 3, 2025, they received a check-engine light on May 5 with "only 80 miles on it." The dealer informed them that "fuel injectors need to be replaced (2 of 3) but mechanic says he will do all 3," prompting concerns about reliability during an upcoming long-distance trip. *(Post dated May 7, 2025.)*

101.    A different owner stated that after buying a 2025 Trax in December 2024, the check-engine light appeared and the vehicle displayed "reduced engine power." At the dealership, they were told there were "wiring issues" and that the MAP sensor needed replacement. The owner was "looking to trade this off before it becomes a major problem." *(Post dated May 9, 2025.)*

102.    Another consumer reported that eight days after purchasing a 2025 Trax, the check-engine light appeared and the dealer informed them "all 3 cylinders had to be replaced." The service advisor also admitted the dealership had "another one in the shop that's been waiting 2 weeks for the parts." The owner stated, "I don't even want this car anymore." *(Post dated Nov. 26, 2025.)*

103.    On CarTalk.com,[2] one consumer asked whether the 2024 Chevrolet Trax is "a troublesome car," prompting a response indicating that the model suffers from "engine performance and instrument panel issues." (Post by user Mustangman, July 29, 2025.

104.    Additional contributors in the same CarTalk discussion affirmed recurring problems with the Trax, with one user responding "Yes," when asked whether the Trax has "any major problem," identifying engine and electrical problems as known issues. (Posts by users car 45 and Mustangman, July 26-29, 2025.)

---

[2] 2024 Chevrolet Trax – Is This a Troublesome Car?, *Car Talk Community*, https://community.cartalk.com/t/2024-chevrolet-trax-is-this-a-troublesome-car/201174 (last visited Feb. 25, 2026).

105.    In a large Facebook group for 2024-2026 Trax owners,[3] one owner reported a catastrophic engine failure at highway speed on Christmas Day, stating: "I heard a loud bang from the engine, smoke billowed, and it seems to have blown a piston through the bottom of the engine… I lost all the oil and we found the piston about a quarter of a mile behind where I pulled over." (Post by Marla Alderman.)

106.    Multiple consumers responded with similar experiences or technical explanations. One stated that at his dealership, "these things are showing up all the time," and further commented that "those daewoo three cylinders are such a bad engine." (Post by Paul Petlewski.)

107.    Another owner reported that their 2025 Trax "happened with a lot less mileage," and required "new engine Turbo and any oil lines associated," noting that owners should "expect to be out of a vehicle for 2 to 4 months." (Post by Richard Sheltman.)

108.    Several owners described repeated blown pistons. One stated: "My 24 done the same thing… my piston went right in the motor and could not be taken out… got it back after 3 months and had it 13 days and done it again." (Post by Latrisha Allen.)

109.    Another owner reported hearing "a big bang from the engine" upon startup at approximately "7300 miles." (Post by Dennis Haynes.)

110.    A tow operator posted that Chevrolet Trax vehicles regularly present with engine problems, writing: "I tow cars for a living… stay far away from the Chevy Trax… she had problem after problem. With oil pressure problems, turbo issues and intake issues." (Post by Josh Hoover.)

111.    Other owners reported repeated check-engine warnings and failures within the first few thousand miles, including one whose 2025 Trax "less then 3,000 miles… has been to the dealership 3 times" for the same check-engine issue, and that "every time they say it's fixed the check engine light comes back on." (Post by Austin Keller.)

---

[3] 2024 / 2025 / 2026+ Chevy Trax Owners, *Facebook Group,* https://www.facebook.com/groups/1804200580427841 (last visited Feb. 25, 2026).

112.    Consumers also reported delays and inability to obtain warranty repairs, including one whose "2024 has been in the shop for six weeks with no engine and no idea when they will get one." (Post by Jerry Fitzpatrick.)

**GM Had Superior and Exclusive Knowledge of the Engine System Defect.**

113.    GM had superior and exclusive knowledge of the Engine System Defect and knew or should have known that the Defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

114.    Discovery will show that before Plaintiffs purchased their Class Vehicle, and since at least 2022, GM knew about the Engine System Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to GM and its dealers who are their agents for vehicle repairs, consumer complaints regarding earlier model years equipped with the same Engine System, testing conducted in response to those complaints, high failure rates and replacement part sales data, consumer complaints to NHTSA (which GM monitors), by developing TSBs in an effort to address the Engine System Defect, and through other aggregate data from GM dealers about the problem.

115.    GM is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, GM conducts tests, including pre-sale durability testing, on incoming components, including the Engine System, to verify the parts are free from defect and align with GM's specifications. Thus, GM knew or should have known the Engine System was defective and prone to put drivers in a dangerous position due to the inherent risks of the Engine System Defect.

116.    Additionally, discovery will show that GM knew of the impact of this defect from the sheer number of reports received from dealerships. GM's customer relations department, which interacts with individual dealerships to identify potential common defects, has received numerous reports regarding the Defect, which led to repeated internal communications and TSBs addressing engine noise, leakage, and related failure conditions. GM's customer relations department also collects and analyzes field data including, but not limited to, repair requests made

at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

117.    Defendant's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is Defendant's policy that when a repair is made under warranty the dealership must provide GM with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Defendant, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

118.    Well before the first Class Vehicle was sold, and as early as 2022, GM knew or should have known that the Engine Systems were defective in design and manufacture and that the Defect would adversely affect drivability and safety. The Engine derives from GM's "Small Gasoline Engine III" architecture first introduced in global production in 2019 and deployed in other GM vehicles beginning with the 2020 model year. Pre-production validation, field testing, and internal engineering reviews conducted between 2020 and 2022 revealed premature bearing wear, oil leakage through block fastener bores, and connecting-rod failures under normal operating conditions. By 2021, warranty and test data from related 1.2-liter applications, such as the Chevrolet Trailblazer and Buick Encore GX, showed repeat engine replacements and oil-leak claims at extremely low mileage. GM's own service publications, including Technical Service Bulletins 20-NA-084 and PIP5938 issued prior to the 2024 model year launch, confirm that GM was aware of abnormal engine noise, oil leakage, and internal mechanical failure in this engine family well before the Class Vehicles reached the market.

119.    GM's own service communications and TSBs corroborate the foregoing and show knowledge of engine noise, leakage, and failure conditions in the Class Vehicles' engine family, including:

(a)     TSB 20-NA-084 (April 3, 2020): Applicable to 2020 Chevrolet Trailblazer and 2020 Buick Encore GX. Addresses abnormal "deep thudding" or knocking noises from the 1.2-liter turbocharged three-cylinder engine and characterizes the condition as a

normal operating characteristic; instructs dealers not to replace the engine based solely on the reported noise.

(b)    PIP5938 (February 14, 2023; revised August 22, 2023): Applicable to 2020-2024 Buick Encore GX, 2024 Buick Envista, 2021-2024 Chevrolet Trailblazer, and 2024 Chevrolet Trax. Notes the presence of fine metallic particles in engine oil associated with wet-belt and wear-in phenomena; instructs that such debris is "normal" and cautions dealers not to replace the engine unless severe internal damage is confirmed.

(c)    PIP5947 (June 27, 2023; revised as PIP5947A December 11, 2023; and PIP5947C March 6, 2024): Applicable to 2024 Buick Encore GX, 2024 Buick Envista, 2024 Chevrolet Trailblazer, and 2024 Chevrolet Trax. Addresses oil consumption and blue smoke complaints at low mileage; identifies cam/cover internal faults and directs replacement of the affected cover assembly rather than engine replacement.

(d)    TSB 23-NA-122 (December 18, 2023; revised May 9, 2025): Applicable to 2020-2024 Buick Encore, 2024 Buick Envista, 2024 Chevrolet Trax, and 2021-present Chevrolet Trailblazers. Acknowledges engine-oil leakage traced to porosity at engine block bolt-hole locations; instructs Loctite 565 procedure and expressly states "Do not replace the engine."

(e)    TSB 23-NA-141 (August 4, 2023): Applicable to 2020-2024 Buick Encore GX, 2021-2024 Chevrolet Trailblazer, 2024 Buick Envista, and 2024 Chevrolet Trax. Provides diagnostic and repair information for engine-oil seepage or leakage at the oil-pan-to-block and front timing-cover sealing surfaces. The bulletin instructs technicians to clean and reseal the joints using GM sealant procedure #12-11-08 and, again, explicitly states "Do Not replace the engine for this condition." GM identifies the concern as a "seepage characteristic," demonstrating awareness of persistent oil-system leakage within the Class Vehicles without offering a permanent repair or correction.

(f)    TSB 24-NA-021 (July 11, 2024): Applicable to 2023-2024 Buick Encore GX, 2024 Buick Envista, 2023-2024 Chevrolet Trailblazer, and 2024 Chevrolet Trax. Advises dealers of Malfunction Indicator Lamp (MIL) illumination with DTCs P0521,

P06DD, and/or P06DE, linked to oil-pressure-sensor or variable-displacement-pump control faults. The bulletin directs oil-pressure testing, wiring inspection, and control-valve cleaning, but again cautions against unnecessary engine replacement. GM characterizes the issue as an electrical or calibration concern, although field reports show it coincides with oil-pressure irregularities preceding bearing damage and engine failure.

(g)    TSB 24-NA-123 (September 18, 2024): Applicable to 2024 Buick Encore GX, 2024 Buick Envista, 2024 Chevrolet Trailblazer, and 2024 Chevrolet Trax. Provides additional guidance to dealers for diagnosing lubrication-related complaints and seepage on the 1.2-liter engine; emphasizes non-replacement remedies and directs sealant application or cover resealing rather than engine replacement.

120.    Collectively, these manufacturer communications show GM's prior knowledge of engine noise, oil leakage, and failure modes affecting the shared 1.2-liter engine architecture used in the 2024-present Buick Encore GX, Buick Envista, Chevrolet Trailblazer, and Chevrolet Trax, as well as GM's direction to their authorized dealers toward procedures that do not correct the underlying defect.

121.    The existence of the Engine System Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Engine System Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

122.    Reasonable consumers, like Plaintiffs, expect that a vehicle's engine assembly is safe, will function in a manner that will not pose a safety risk, and is free from defects. Plaintiffs and Class Members further reasonably expect that GM will not sell or lease vehicles with known safety defects, such as the Engine System Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect GM to conceal and fail to disclose the Engine System Defect to them, and to then continually deny its existence.

**GM Has Actively Concealed the Engine System Defect.**

123.   Despite its knowledge of the Engine System Defect in the Class Vehicles, GM actively concealed the existence and nature of the Defect from Plaintiffs and Class Members. Specifically, GM failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

(a)   any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the Engine System;

(b)   that the Class Vehicles, including the Engine System, were not in good working order, were defective, and were not fit for their intended purposes; and

(c)   that the Class Vehicles and their Engine Systems were defective, despite the fact that GM learned of such defects as early as 2022.

These concealments occurred notwithstanding GM's internal documentation and TSBs acknowledging abnormal engine noise, oil leakage, and internal failure in the 1.2-liter engine family beginning in 2020, and continuing through 2025.

124.   Discovery will show that when consumers present their Class Vehicles to an authorized GM dealer for Engine System repairs, GM's diagnostic protocols and repair guidance direct technicians to treat oil seepage, bearing noise, and low-oil-pressure warnings as "normal operating characteristics." Dealers are instructed to clean, reseal, or reprogram rather than replace the engine, thereby concealing the underlying defect.

125.   GM has caused Plaintiffs and Class Members to expend money and/or time at its dealerships to diagnose, repair or replace the Class Vehicles' Engine System and/or related components, despite GM's knowledge of the Engine System Defect.

**GM Has Unjustly Retained a Substantial Benefit.**

126.   Discovery will show that Defendant unlawfully failed to disclose the alleged defect to induce Plaintiffs and other putative Class Members to purchase or lease the Class Vehicles.

127.   Plaintiffs further allege that Defendant thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs'.

128.    As discussed above, therefore, Plaintiffs allege that Defendant unlawfully induced them to purchase their Class Vehicle by concealing a material fact (the defective Engine System) and that they would have paid less for the Class Vehicle, or not purchased it at all, had they known of the Defect.

129.    Accordingly, Defendant's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material omissions that did—and likely will continue to—deceive consumers, should be disgorged.

**GM Authorized Dealers Are Defendant's Agents.**

130.    In promoting, selling, and repairing its defective vehicles, GM acts through numerous authorized dealers who act as, and represent themselves to the public as, exclusive GM representatives and agents. That the dealers act as GM's agents is demonstrated by the following facts:

(a)    The authorized GM dealerships complete all service and repair according to GM's instructions, which GM issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents;

(b)    Technicians at GM dealerships are required to go to at least yearly GM-given trainings in order to remain certified to work on GM-branded vehicles, at which they receive training on proprietary systems, which provides guided, step-by- step instructions on diagnosing and repairing GM-branded vehicles;

(c)    Consumers are able to receive services under GM's issued NVLW and LPW only at GM's authorized dealerships, and they are able to receive these services because of the agreements between GM and the authorized dealers. These agreements provide GM with a significant amount of control over the actions of the authorized dealerships;

(d)    The warranties provided by GM for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

(e)    GM dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

(f)    GM controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with GM's authorization;

(g)    GM has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public, particularly the advertising; and

(h)    GM implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized GM dealerships to address complaints of the Defect.

131.    Indeed, GM's 2024 Chevrolet Trax warranty booklets make it abundantly clear that GM's authorized dealerships are its agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers that to obtain warranty service, "take the vehicle to an authorized Chevrolet dealership within the warranty period and request the needed repairs."

132.    Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of GM. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either GM or its agent dealerships to establish privity of contract between GM, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and GM. It also establishes that Plaintiffs were dealing with GM through its authorized agent dealerships when she was given the NVLW and LPW associated with their Class Vehicle, without any ability to negotiate the terms of such warranties.

**GM's Warranties Were Unconscionable.**

133.    Plaintiffs signed a contract for sale with a GM authorized dealer, and with that sale, was presented with the terms of the Warranty as drafted by GM. While Plaintiffs have some ability to negotiate price of the vehicle, she has no ability to negotiate the terms of the Warranty. Plaintiffs had no bargaining power with respect to the Warranty, was presented with it as a *fait*

*accompli,* and had to accept it in the exact form in which it was presented to them, which occurred after the vehicle purchase transaction was completed. Plaintiffs had no meaningful choice regarding any aspect of the Warranty or its terms, including durational limitations of time and mileage. The terms of the warranty unreasonably favored Defendant over Plaintiffs and the members of the Class; a gross disparity in bargaining power existed as between Defendant and Class members; and Defendant knew or should have known that the Engine System Defect would manifest in the Class Vehicles both before and after the Warranty, thereby rendering the time and mileage limitations insufficient, inadequate, and unconscionable.

134.    GM drafted the terms of the Warranty in part by using its exclusive, superior knowledge of the existence and likely manifestation of the Defect. Plaintiffs and Class Members were entirely ignorant of the Defect when purchasing their Vehicles and when presented with the Warranty. Plaintiffs' acceptance of the Warranty and its terms, including any disclaimers or durational limits, was neither knowing nor voluntary. Defendant knew or should have known at the time of sale that the Class Vehicles were defective and would fail prematurely solely because of a defect in design, materials, and workmanship, to wit, the Engine System Defect. Plaintiffs and Class Members, on the other hand, had no notice of or ability to detect the Defect prior to purchasing the Class Vehicles. For this reason, the terms of the Warranty unreasonably favored Defendant over Plaintiffs and Class Members, and Plaintiffs' and Class Members' acceptance of the Warranty's durational limitations, to the extent they are found to apply so as to exclude instances where the Defect manifested outside of them, was neither knowing nor voluntary, thereby rendering such limitation unconscionable and ineffective.

135.    Plaintiffs were also not aware and could not have been aware that GM would willfully not inform them of the Defect which affects the safety of her vehicle and that the Defect could manifest outside of the durational limit of the Warranty, despite GM's knowledge of this. *See Carlson v. Gen. Motors Corp.*, 883 F.2d 287 (4th Cir. 1989), cert. denied, 495 U.S. 904 (1990) ("[P]roof that GM knew of and failed to disclose major, inherent product defects would obviously suggest that its imposition of the challenged 'durational limitations' on implied warranties constituted 'overreaching,' and that the disclaimers themselves were therefore 'unconscionable.'")

**TOLLING OF THE STATUTES OF LIMITATIONS**

136.    Any applicable statute of limitations has been tolled by GM's knowing and active concealment of the Engine System Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Defect or GM's deception with respect to the Defect. GM and its agents continue to deny the existence and extent of the Defect, even when questioned by Plaintiffs and members of the Class.

137.    Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was concealing a defect and/or the Class Vehicles contained the Engine System Defect and the corresponding safety risk. As alleged herein, the existence of the Engine System Defect was material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendant was concealing the Defect.

138.    At all times, GM is and was under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, and grade of the Class Vehicles and to disclose the Engine System Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Engine System in Class Vehicles.

139.    GM knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on GM's knowing, active, and affirmative concealment.

140.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and GM's fraudulent concealment, and GM is estopped from relying on any statutes of limitations in defense of this action.

**CLASS ACTION ALLEGATIONS**

141.    Plaintiffs bring this lawsuit as a class action on behalf of herself and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure

23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

142.    The Class and Sub-Classes are defined as:

**Class**:  All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

**California Sub-Class**: All members of the Nationwide Class who reside in the State of California.

**CLRA Sub-Class**: All members of the California Sub-Class who are "consumers" within the meaning of California Civil Code § 1761(d).

**Implied Warranty Sub-Class**: All members of the Nationwide Class who purchased or leased their vehicles in the State of California.

**New Hampshire Sub-Class**: All members of the Nationwide Class who purchased or leased their Class Vehicle in the State of New Hampshire.

**Maine Sub-Class**: All members of the Nationwide Class who purchased or leased their Class Vehicle in the State of Maine.

**Missouri Sub-Class**: All members of the Nationwide Class who purchased or leased their Class Vehicle in the State of Missouri.

143.    Excluded from the Class and Sub-Classes are:  (1) Defendant, any entity or division in which Defendant have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserves the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub- Classes should be expanded or otherwise modified.

144.    Numerosity: Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

145.    Typicality:  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by GM. The representative Plaintiffs, like all Class Members, has been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective Engine System and/or its components. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

146.    Commonality:  There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

(a)    Whether Class Vehicles suffer from defects relating to the Engine System;

(b)    Whether the defects relating to the Engine System constitute an unreasonable safety risk;

(c)    Whether Defendant knew about the defects pertaining to the Engine System and, if so, how long Defendant have known of the Defect;

(d)    Whether the defective nature of the Engine System constitutes a material fact;

(e)    Whether Defendant have had an ongoing duty to disclose the defective nature of the Engine System to Plaintiffs and Class Members;

(f)    Whether Plaintiffs and the other Class Members are entitled to equitable relief, including a preliminary and/or a permanent injunction;

(g)    Whether Defendant knew or reasonably should have known of the defects pertaining to the Engine System before they sold and leased Class Vehicles to Class Members;

(h)    Whether Defendant should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective Engine System and/or its components;

(i)    Whether Defendant are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective Engine System and/or its components;

(j)    Whether Defendant breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act;

(k)    Whether Defendant breached the implied warranty of merchantability pursuant to the Song-Beverly Act;

(l)    Whether Defendant breached their express warranties under California Law; and

(m)    Whether Defendant breached express warranties pursuant to the Magnuson- Moss Warranty Act.

147.    Adequate Representation: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intends to vigorously prosecute this action.

148.    Predominance and Superiority: Plaintiffs and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct will continue

45

unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## FIRST CAUSE OF ACTION

### (Violation of California's Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.*)

### (On Behalf of the CLRA Sub-Class)

149. Plaintiffs Samantha Cook and Donna Cook ("California Plaintiffs") incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

150. California Plaintiffs bring this cause of action on behalf of themselves and the CLRA Sub-Class.

151. Defendant is a "person" as defined by California Civil Code § 1761(c).

152. California Plaintiffs and the CLRA Sub-Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased or leased their Class Vehicles primarily for personal, family, or household use.

153. By failing to disclose and concealing the defective nature of the Engine System from California Plaintiffs and prospective CLRA Sub-Class members, Defendant violated California Civil Code § 1770(a), as they represented that the Class Vehicles and their Engine Systems had characteristics and benefits that they do not have and represented that the Class Vehicles and their Engine Systems were of a particular standard, quality, or grade when they were actually of another. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

154. Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

155. Defendant knew that the Class Vehicles and their Engine Systems suffered from an inherent defect, were defectively designed, and were not suitable for their intended use.

156. As a result of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including California Plaintiffs, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine System Defect, California Plaintiffs and the CLRA Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' Engine Systems and their components are substantially certain to fail before their expected useful life has run.

157. Defendant was under a duty to California Plaintiffs and the CLRA Sub- Class members to disclose the defective nature of the Engine System and/or the associated repair costs because:

(a) Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' Engine System;

(b) California Plaintiffs and the CLRA Sub-Class members could not reasonably have been expected to learn or discover that their Engine System had a dangerous safety defect until it manifested; and

(c) Defendant knew that California Plaintiffs and the CLRA Sub-Class members could not reasonably have been expected to learn of or discover the safety defect.

158. In failing to disclose the defective nature of the Engine System, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

159. The facts Defendant concealed from or failed to disclose to California Plaintiffs and the CLRA Sub-Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less. Had California Plaintiffs and the CLRA Sub-Class members known that the Class Vehicles' Engine System was defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

160. California Plaintiffs and the CLRA Sub-Class members are reasonable consumers who do not expect the Engine Systems installed in their vehicles to exhibit problems such as the Engine System Defect. This is the reasonable and objective consumer expectation relating to a vehicle's Engine System.

161. As a result of Defendant's conduct, California Plaintiffs and the CLRA Sub-Class members were harmed and suffered actual damages in that the Class Vehicles experienced and will continue to experience problems such as the Engine System Defect.

162. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, California Plaintiffs and the CLRA Sub-Class members suffered and will continue to suffer actual damages.

163. California Plaintiffs and the CLRA Sub-Class members are entitled to equitable relief.

164. Prior to the filing of this Complaint, on February 19, 2026, California Plaintiffs provided Defendant with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a). As Defendant failed to provide appropriate relief for its violations of the CLRA within the time allowed under statute, California Plaintiffs now seek monetary, compensatory, and punitive damages, in addition to the injunctive and equitable relief previously sought on behalf of themselves and the CLRA Sub-Class.

**SECOND CAUSE OF ACTION**

**(Violation of California Business & Professions Code § 17200, *et seq.*)**

**(On Behalf of the California Sub-Class)**

165. California Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

166. California Plaintiffs bring this cause of action on behalf of themselves and the California Sub-Class (CA Sub-Class).

167. As a result of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including California Plaintiffs, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine System Defect, California Plaintiffs and the CA Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' Engine System and/or its components are substantially certain to fail before their expected useful life has run.

168.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

169.    California Plaintiffs and the CA Sub-Class members are reasonable consumers who do not expect their Engine Systems to exhibit problems such as loss of oil pressure, knocking, or sudden engine shutdown under normal conditions.

170.    Defendant knew the Class Vehicles and their Engine Systems were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

171.    In failing to disclose the Engine System Defect, Defendant have knowingly and intentionally concealed material facts and breached its duty not to do so.

172.    Defendant was under a duty to California Plaintiffs and the CA Sub-Class members to disclose the defective nature of the Class Vehicles and their Engine Systems because:

(a)    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' Engine Systems; and

(b)    Defendant actively concealed the defective nature of the Class Vehicles and their Engine Systems from California Plaintiffs and the CA Sub-Class.

173.    The facts Defendant concealed from or failed to disclose to California Plaintiffs and the CA Sub-Class members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Class Vehicles. Had they known of the Engine System Defect, California Plaintiffs and the other CA Sub-Class members would have paid less for Class Vehicles or would not have purchased or leased them at all.

174.    Defendant continued to conceal the defective nature of the Class Vehicles and their Engine Systems even after California Plaintiffs and the other CA Sub-Class members began to report problems.

175.    Defendant's conduct was and is likely to deceive consumers.

176.    Defendant's acts, conduct, and practices were unlawful, in that they constituted:

(a)    Violations of California's Consumers Legal Remedies Act;

(b)    Violations of the Song-Beverly Consumer Warranty Act;

49

(c)      Violations of the Magnuson-Moss Warranty Act; and

(d)      Breach of Express Warranty under California Commercial Code § 2313.

177.    By their conduct, Defendant have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

178.    Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

179.    As a direct and proximate result of Defendant's unfair and deceptive practices, California Plaintiffs and the other CA Sub-Class members have suffered and will continue to suffer actual damages.

180.    Defendant has been unjustly enriched and should be required to make restitution to California Plaintiffs and the other CA Sub-Class members pursuant to §§ 17203 and 17204 of the Business & Professions Code.

## THIRD CAUSE OF ACTION

**(Breach of Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq.*)**

**(On Behalf of the Implied Warranty Sub-Class)**

181.    California Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

182.    California Plaintiffs bring this cause of action against Defendant on behalf of themselves and the Implied Warranty Sub-Class (IW Sub-Class).

183.    Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

184.    Defendant provided California Plaintiffs and the IW Sub-Class members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles and their Engine Systems are not fit for their ordinary purpose of providing reasonably reliable and safe

transportation because, *inter alia*, the Class Vehicles and their Engine Systems suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

185.    Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Engine Systems, which were manufactured, supplied, distributed, and/or sold by GM, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their Engine Systems would be fit for their intended use.

186.    Contrary to the applicable implied warranties, the Class Vehicles and their Engine Systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing California Plaintiffs and the IW Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective Engine Systems.

187.    The Engine System Defect is inherent and was present in each Class Vehicle at the time of sale.

188.    As a result of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine System Defect, California Plaintiffs and the IW Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' Engine Systems and/or its components are substantially certain to fail before their expected useful life has run.

189.    Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

### FOURTH CAUSE OF ACTION

### (Breach of Express Warranty Pursuant to Cal. Com. Code §§ 2313, 10210)

### (On Behalf of the California Sub-Class)

190.    California Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

51

191.    California Plaintiffs bring this cause of action on behalf of themselves and the CA Sub-Class.

192.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain. Accordingly, Defendant's express warranty is an express warranty under California law.

193.    The Engine System was manufactured and/or installed in the Class Vehicles by Defendant and is covered by the express warranty.

194.    In a section entitled "New Vehicle Limited Warranty," Defendant's express warranty provides, in relevant part, that "GM will repair or replace any part that is defective in material or workmanship under normal use." The warranty further provides that "[a]ll repairs/replacements made under this warranty are free of charge. The replaced or repaired parts are covered only until this New Vehicle Limited Warranty expires."

195.    Defendant breached the express warranties by selling and leasing Class Vehicles with Engine Systems that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the Engine System or by performing temporary sealant or cover replacements that fail to correct the root cause of the Defect. In addition, when Defendant did agree to pay a portion of the costs, Defendant nevertheless breached the express warranty by simply replacing Class Members' defective Engine Systems with similarly defective Engine Systems, thus failing to "repair" the defect.

196.    California Plaintiffs were not required to notify GM of the breach or was not required to do so because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the Engine Systems, and from other internal sources.

197.    As a direct and proximate cause of Defendant's breach, California Plaintiffs and the other Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, California Plaintiffs and the other Class

Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

198.    California Plaintiffs and the other Class Members are entitled to legal and equitable relief against Defendant, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## FIFTH CAUSE OF ACTION

**(Violations of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:1 et seq.)**

**(On Behalf of the New Hampshire Sub-Class)**

199.    Plaintiff Zeletsky ("New Hampshire Plaintiff") and members of the New Hampshire Sub-Class incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

200.    New Hampshire Plaintiff brings this cause of action on behalf of herself and the New Hampshire Sub-Class.

201.    The New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:1 et seq. ("New Hampshire CPA") prohibits "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce."

202.    New Hampshire Plaintiff and members of the New Hampshire Sub-Class are "persons" within the meaning of N.H. Rev. Stat. Ann. § 358-A:1, I.

203.    Defendant participated in unfair methods of competition or unfair or deceptive acts or practices that violated the New Hampshire CPA as described below and alleged throughout the Complaint. By failing to disclose the Engine System Defect, by concealing the Engine System Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Defendant knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Defendant systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine System Defect in the course of its

business. The facts concerning the inherently defective nature of the Class Vehicles would be material to a reasonable consumer.

204. Defendant engaged in "trade" or "commerce" as defined by N.H. Rev. Stat. Ann. § 358-A:1, II when it designed, manufactured, distributed, marketed, sold, leased, and warranted the Class Vehicles in New Hampshire.

205. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the class Vehicles.

206. Defendant's unfair and deceptive acts were made repeatedly in the course of trade or commerce and had the capacity to deceive a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

207. Defendant knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

208. Defendant knew or should have known that its conduct violated the New Hampshire CPA.

209. New Hampshire Plaintiff and the New Hampshire Sub-Class Members reasonably relied on Defendant's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

210. Had New Hampshire Plaintiff and the New Hampshire sub-Class Members known that the Class Vehicle would exhibit the Engine System Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

211. Defendant owed New Hampshire Plaintiff and the New Hampshire Sub-Class Members a duty to disclose the truth about the Engine System Defect because Defendant: (a) possessed exclusive knowledge of the Class Vehicles and the Engine System Defect; (b) intentionally concealed the foregoing from New Hampshire Plaintiff and the New Hampshire

Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from New Hampshire Plaintiff and the New Hampshire Sub-Class Members that contradicted these representations.

212.    Due to Defendant's specific and superior knowledge that the engines in the Class Vehicles will fail due to the Engine System Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by New Hampshire Plaintiff and the New Hampshire Sub-Class Members on these material representations, Defendant had a duty to disclose to Class members that the engines will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the engines will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to New Hampshire Plaintiff and the New Hampshire Sub-Class Members, Defendant had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by New Hampshire Plaintiff and the New Hampshire Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM consumers. Defendant represented to New Hampshire Plaintiff and the New Hampshire Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the Class Vehicles fail due to the Engine System Defect.

213.    As a direct and proximate result of Defendant's unfair and deceptive acts, New Hampshire Plaintiff and the New Hampshire Sub-Class have suffered actual ascertainable losses, including overpayment for the Class Vehicles, diminution in value, out-of-pocket repair costs, and related losses.

214.   Pursuant to N.H. Rev. Stat. Ann. § 358-A:10, New Hampshire Plaintiff and the New Hampshire Sub-Class seek actual damages or $1,000, whichever is greater, treble damages for willful or knowing violations, reasonable attorneys' fees and costs, and injunctive relief.

**SIXTH CAUSE OF ACTION**

**(Breach of Express Warranty, N.H. Rev. Stat. Ann. § 382-A:2-313)**

**(On Behalf of the New Hampshire Sub-Class)**

215.   New Hampshire Plaintiff and members of the New Hampshire Sub-Class incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

216.   New Hampshire Plaintiff brings this cause of action on behalf of herself and the New Hampshire Sub-Class.

217.   Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. Ann. § 382-A:2-104, and a "seller" of motor vehicles under 382-A:2-103(1)(d).

218.   With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

219.   The Class Vehicles are and were at all relevant times "goods" within the meaning of NH Rev. Stat. §§ 382-A:2A-105(1) and 2A-103(1)(h).

220.   Defendant provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

221.   Under the Warranties, Defendant expressly warranted the following: "the warranty covers repairs to correct an vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Engine System Defect does not fall into any of the above excluded categories, it is covered under Defendant's express warranty. Defendant agreed to provide such repairs "including towing, parts, and labor… at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

222.    Furthermore, under the Powertrain Component of the Warranties, Defendant expressly warranted that the powertrain components listed therein, including the engine and "Components such as engine block, cylinder head, manifolds, timing gears, oil pump, all internally lubricated parts, seals, gaskets and internal electrical components" and "any actuators directly connected to the are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles.

223.    The Engine System Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to "and the New Hampshire Sub-Class Members.

224.    New Hampshire Plaintiff relied on Defendant's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

225.    Under the express Warranties, Defendant was obligated to correct the Engine System Defect in the vehicles owned or leased by New Hampshire Plaintiff and the New Hampshire Sub-Class Members.

226.    Although Defendant was obligated to correct the Engine System Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

227.    Defendant breached its express warranties under N.H. Rev. Stat. Ann. § 382-A:2-313 by selling Class Vehicles that contained the Engine System Defect at the time of sale, which substantially impairs their use, value, and safety.

228.    Defendant further breached its express warranties by refusing or failing to repair, replace, or adjust the defective engine components within a reasonable time after consumers provided notice of the Defect.

229.    The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect New Hampshire Plaintiff and the New Hampshire Sub-Class Members. Among other things, New Hampshire Plaintiff and the New Hampshire Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between

Defendant and the Class members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale.

230.    New Hampshire Plaintiff and the New Hampshire Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

231.    New Hampshire Plaintiff and the New Hampshire Sub-Class Members were not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the Engine System Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

232.    Because Defendant, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine System Defect if Defendant determines the repairs are appropriately covered under the Warranties, Defendant cannot now deny that the Warranties cover the Engine System Defect.

233.    Because Defendant has not been able to remedy the Engine System Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

234.    As a direct and proximate cause of Defendant's breach, New Hampshire Plaintiff and the New Hampshire Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Hampshire Plaintiff and the New Hampshire Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

235.    As a direct and proximate result of Defendant's breach of express warranties, New Hampshire Plaintiff and the New Hampshire Sub-Class Members have been damaged in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**

**(Breach of Implied Warranty of Merchantability under New Hampshire law, N.H. Rev. Stat. Ann. § 382-A:2-314)**

**(On Behalf of the New Hampshire Sub-Class)**

236.    New Hampshire Plaintiff and members of the New Hampshire Sub-Class incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

237.    New Hampshire Plaintiff brings this cause of action on behalf of herself and the New Hampshire Sub-Class.

238.    Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. Ann. § 382-A:2-104, and a "seller" of motor vehicles under 382-A:2-103(1)(d).

239.    With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

240.    The Class Vehicles are and were at all relevant times "goods" within the meaning of NH Rev. Stat. §§ 382-A:2A-105(1) and 2A-103(1)(h).

241.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212.

242.    Defendant provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

243.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for ordinary purposes; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

244.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class

Vehicles are defective, including, but not limited to, the defective design or manufacture of their engines and the existence of the Engine System Defect at the time of sale or lease and thereafter. Defendant knew of this defect at the time these sale or lease transactions occurred.

245.    As a result of Defendant's breach of the applicable implied warranties, New Hampshire Plaintiff and the New Hampshire Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine System Defect, New Hampshire Plaintiff and the New Hampshire Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engines components are substantially certain to fail before their expected useful life has run.

246.    Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212.

247.    New Hampshire Plaintiff and the New Hampshire Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

248.    New Hampshire Plaintiff and the New Hampshire Sub-Class Members were not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the Engine System Defect from the complaints and service requests  it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

249.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, New Hampshire Plaintiff and the New Hampshire Sub-Class have suffered damages in an amount to be determined at trial, and are entitled to recover actual damages, diminution in value, and consequential damages.

**EIGHTH CAUSE OF ACTION**

**(Violations of the Maine Unfair Trade Practices Act, M.R.S.A. TIT. 5 § 205-A et seq.)**

**(On Behalf of the Maine Sub-Class)**

250.    Plaintiffs Joe and Diane Baucom ("Maine Plaintiffs") and members of the Maine Sub-Class incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

251.    Maine Plaintiffs bring this cause of action on behalf of themselves and the Maine Sub-Class.

252.    The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Me. Rev. Stat. Ann. tit. 5, § 207. 1837. Defendant, Maine Plaintiffs, and the Maine Sub-Class Members are "persons" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(2).

253.    Defendant was and is engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(3).

254.    Defendant participated in misleading, false, or deceptive acts that violated the Maine UTPA as described below and alleged throughout the Complaint. By failing to disclose the Engine System Defect, by concealing the Engine System Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Defendant knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Defendant systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine System Defect in the course of its business.

255.    Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

256.    Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

257.    Defendant knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

258.    Defendant knew or should have known that its conduct violated the Maine UTPA.

259.    Maine Plaintiffs and the Maine Sub-Class Members reasonably relied on Defendant's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

260.    Had Maine Plaintiffs and the Maine Sub-Class Members known that the Class Vehicles would exhibit the Engine System Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendant's misconduct.

261.    Defendant owed Maine Plaintiffs and the Maine Sub-Class Members a duty to disclose the truth about the Engine System Defect because Defendant: (a) possessed exclusive knowledge of the Class Vehicles and the Engine System Defect; (b) intentionally concealed the foregoing from Maine Plaintiff and the Maine Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Maine Plaintiff and the Maine Sub-Class Members that contradicted these representations.

262.    Due to Defendant's specific and superior knowledge that the engines in the Class Vehicles will fail due to the Engine System Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Maine Plaintiffs and the Maine Sub-Class Members on these material representations, Defendant had a duty to disclose to Class members that the engines will fail in Class Vehicles, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Maine Plaintiffs and the Maine Sub-Class Members, Defendant had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Maine Plaintiffs and the Maine Sub-Class Members. Longevity, durability, performance, and safety are material

concerns to Defendant Class Vehicle consumers. Defendant represented to Maine Plaintiffs and the Maine Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the Class vehicles fail due to the Engine System Defect.

263.    Maine Plaintiffs and the Maine Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendant's conduct, Maine Plaintiffs and the Maine Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

264.    As a result of Defendant's conduct, Maine Plaintiffs and the Maine Sub-Class Members were harmed and suffered actual damages as a result of Defendant's misrepresentations and omissions with regard to their Class Vehicles' engines because they purchased vehicles which do not perform as advertised.

265.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Maine Plaintiffs and the Maine Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

266.    Defendant's violations present a continuing risk to Maine Plaintiffs and the Maine Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

267.    Pursuant to Me. Rev. Stat. Ann. tit. 5 § 213, Maine Plaintiffs and the Maine Sub-Class Members seek an order enjoining Defendant's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Maine UTPA.

### NINTH CAUSE OF ACTION

### (Breach of Express Warranty under Maine law, M.R.S.A. TIT. 11 § 2-313)

### (On Behalf of the Maine Sub-Class)

268.    Maine Plaintiffs and members of the Maine Sub-Class incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

269. Maine Plaintiffs bring this cause of action on behalf of themselves and the Maine Sub-Class.

270. Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Me. Rev. Stat. Ann. tit. 11, §§ 2-104(1) and 2-1103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

271. With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Me. Rev. Stat. Ann. tit. 11,§ 2-1103(1)(p).

272. The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. tit. 11,§§ 2-105(1), and 2-1103(1)(h).

273. Defendant provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

274. Defendant provided all purchasers and lessees of Chevrolet or Defendant-branded Class Vehicles with the Chevrolet/Defendant Warranty.

275. Under the Warranties, Defendant expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Engine System Defect does not fall into any of the above excluded categories, it is covered under Defendant's express warranty. Defendant agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or Defendant-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

276. Furthermore, under the Powertrain Component of the Warranties, Defendant expressly warranted that the powertrain components listed therein, including the engine and "Components such as engine block, cylinder head, manifolds, timing gears, oil pump, all internally lubricated parts, seals, gaskets and internal electrical components" and "any actuators directly connected to the are covered under the Warranties for up to 5 years or 60,000 miles,

whichever comes first, for Chevrolet or GM-branded Class Vehicles (the "Powertrain Warranties").

277.    The Engine System Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Maine Plaintiffs and the Maine Sub-Class Members.

278.    Maine Plaintiffs relied on Defendant's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

279.    Under the express Warranties, Defendant was obligated to correct the Engine System Defect in the vehicles owned or leased by Maine Plaintiffs and the Maine Sub-Class Members.

280.    Although Defendant was obligated to correct the Engine System Defect, none of the attempted fixes to the engine are adequate under the terms of the Warranties, as they did not cure the defect.

281.    Defendant and its agent dealers have failed and refused to conform the engines to the express Warranties. Defendant's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

282.    Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

283.    The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Maine Plaintiffs and the Maine Sub-Class Members. Among other things, Maine Plaintiffs and the Maine Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Class members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale.

284.    Maine Plaintiffs and the Maine Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

285.    Maine Plaintiffs and the Maine Sub-Class Members were not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach

of written warranty would have been futile. Defendant was also on notice of the Engine System Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

286.    Because Defendant, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine System Defect if Defendant determines the repairs are appropriately covered under the Warranties, Defendant cannot now deny that the Warranties cover the Engine System Defect.

287.    Because Defendant has not been able to remedy the Engine System Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

288.    As a direct and proximate cause of Defendant's breach, Maine Plaintiffs and the Maine Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maine Plaintiffs and the Maine Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

289.    As a direct and proximate result of Defendant's breach of express warranties, Maine Plaintiffs and the Maine Sub-Class Members have been damaged in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

**(Breach of Implied Warranty of Merchantability under Maine law, M.R.S.A. TIT. 11 § 2-314)**

**(On Behalf of the Maine Sub-Class)**

290.    Maine Plaintiffs and members of the Maine Sub-Class incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

291.    Maine Plaintiffs bring this cause of action on behalf of themselves and the Maine Sub-Class.

292.    Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Me. Rev. Stat. Ann. tit. 11, §§ 2-104(1) and 2-1103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

293.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Me. Rev. Stat. Ann. tit. 11,§ 2-1103(1)(p).

294.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. tit. 11,§§ 2-105(1), and 2-1103(1)(h).

295.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Me. Rev. Stat. Ann. tit. 11, §§ 2-314 and 2-1212.

296.    Defendant provided Maine Plaintiffs and sub=class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

297.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Defendant were safe and reliable for ordinary purposes; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

298.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their engines and the existence of the Engine System Defect at the time of sale or lease and thereafter. Defendant knew of this defect at the time these sale or lease transactions occurred.

299.    As a result of Defendant's breach of the applicable implied warranties, Maine Plaintiffs and the Maine Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine System Defect, Maine Plaintiffs and the Maine Sub-Class Members were harmed and suffered

actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

300.    Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation Me. Rev. Stat. Ann. tit. 11, §§ 2-314 and 2-1212.

301.    Maine Plaintiffs and the Maine Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

302.    Maine Plaintiffs and the Maine Sub-Class Members were not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the Engine System Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

303.    As a direct and proximate cause of Defendant's breach, Maine Plaintiffs and the Maine Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maine Plaintiffs and the Maine Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair

304.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Maine Plaintiffs and the Maine Sub-Class Members have been damaged in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

## (Violations of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 et seq.)

## (On Behalf of the Missouri Sub-Class)

305.    Plaintiff Smith ("Missouri Plaintiff") and members of the Missouri Sub-Class incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

306.    Missouri Plaintiff brings this cause of action on behalf of herself and the Missouri Sub-Class.

307.    Defendant, Missouri Plaintiff, and the Missouri Sub-Class Members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

308.    Defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

309.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020. Defendant used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in violation of the Missouri MPA.

310.    Defendant participated in unfair or deceptive trade practices that violated the Missouri MPA as described below and alleged throughout the Complaint. By failing to disclose the Engine System Defect, by concealing the Engine System Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Defendant knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Defendant systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine System Defect in the course of its business.

311.    Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

312. Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

313. Defendant knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

314. Defendant knew or should have known that its conduct violated the Missouri MPA.

315. Missouri Plaintiff and the Missouri Sub-Class Members reasonably relied on Defendant's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

316. Had Missouri Plaintiff and the Missouri Sub-Class Members known that the Class Vehicles would exhibit the Engine System Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendant's misconduct.

317. Defendant owed Missouri Plaintiff and the Missouri Sub-Class Members a duty to disclose the truth about the Engine System Defect because Defendant: (a) possessed exclusive knowledge of the Class Vehicles and the Engine System Defect; (b) intentionally concealed the foregoing from Missouri Plaintiff and the Missouri Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Missouri Plaintiff and the Missouri Sub-Class Members that contradicted these representations.

318. Due to Defendant's specific and superior knowledge that the engines in the Class Vehicles will fail due to the Engine System Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Missouri Plaintiff and the Missouri Sub-Class Members on these material representations, Defendant had a duty to disclose to Class members that the engines will cause failure in Class Vehicles, and that failure of the engines will cause damage to Class Vehicle engines and engine systems, and that Class members would be

required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Missouri Plaintiff and the Missouri Sub-Class Members, Defendant had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Missouri Plaintiff and the Missouri Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Defendant truck consumers. Defendant represented to Missouri Plaintiff and the Missouri Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine System Defect.

319.    Missouri Plaintiff and the Missouri Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendant's conduct, Missouri Plaintiff and the Missouri Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

320.    As a result of Defendant's conduct, Missouri Plaintiff and the Missouri Sub-Class Members were harmed and suffered an ascertainable loss of money or property as a result of Defendant's misrepresentations and omissions with regard to their Class Vehicles' engines because they purchased vehicles which do not perform as advertised impacting the value of the vehicle.

321.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Missouri Plaintiff and the Missouri Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

322.    Defendant's violations present a continuing risk to Missouri Plaintiff and the Missouri Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

323.    Defendant is liable to Missouri Plaintiff and the Missouri Sub-Class Members for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages,

as well as injunctive relief enjoining Defendant's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## TWELFTH CAUSE OF ACTION

### (Breach of Express Warranty under Missouri law, Mo. Rev. Stat. § 400.2-313)

### (On Behalf of the Missouri Sub-Class)

324.   Missouri Plaintiff and members of the Missouri Sub-Class incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

325.   Missouri Plaintiff brings this cause of action on behalf of herself and the Missouri Sub-Class.

326.   Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1), and a "seller" of motor vehicles under § 400.2-103(1)(d).

327.   With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p).

328.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

329.   Defendant provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

330.   Defendant provided all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

331.   Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Engine System Defect does not fall into any of the above excluded categories, it is covered under Defendant's express warranty. Defendant agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles,

whichever comes first, for Chevrolet or GM-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

332. Furthermore, under the Powertrain Component of the Warranties, Defendant expressly warranted that the powertrain components listed therein, including the engine and "Components such as engine block, cylinder head, manifolds, timing gears, oil pump, all internally lubricated parts, seals, gaskets and internal electrical components" and "any actuators directly connected to the are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles (the "Powertrain Warranties").

333. Defendant manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

334. The Engine System Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Missouri Plaintiff and the Missouri Sub-Class Members.

335. Plaintiffs relied on Defendant's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

336. Under the express Warranties, Defendant was obligated to correct the Engine System Defect in the vehicles owned or leased by Missouri Plaintiff and the Missouri Sub-Class Members.

337. Although Defendant was obligated to correct the Engine System Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

338. Defendant breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Defendant falsely informed Missouri Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

339.    Defendant and its agent dealers have failed and refused to conform the engines to the express Warranties. Defendant's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

340.    Moreover, Defendant's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

341.    The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Missouri Plaintiff and the Missouri Sub-Class Members. Among other things, Missouri Plaintiff and the Missouri Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Class members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale.

342.    Missouri Plaintiff and the Missouri Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

343.    Missouri Plaintiff and the Missouri Sub-Class Members were not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the Engine System Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

344.    Because Defendant, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine System Defect if Defendant determines the repairs are appropriately covered under the Warranties, Defendant cannot now deny that the Warranties cover the Engine System Defect.

345. Because Defendant has not been able to remedy the Engine System Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

346. As a direct and proximate cause of Defendant's breach, Missouri Plaintiff and the Missouri Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Missouri Plaintiff and the Missouri Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

347. As a direct and proximate result of Defendant's breach of express warranties, Missouri Plaintiff and the Missouri Sub-Class Members have been damaged in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION

## (Breach of Implied Warranty of Merchantability under Missouri law, Mo. Rev. Stat. § 400.2-314)

## (On Behalf of the Missouri Sub-Class)

348. Missouri Plaintiff and members of the Missouri Sub-Class incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

349. Missouri Plaintiff brings this cause of action on behalf of herself and the Missouri Sub-Class.

350. Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1), and a "seller" of motor vehicles under § 400.2-103(1)(d).

351. With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p).

352. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Rev. Stat. § 400.2A-103(1)(h).

353.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mo. Rev. Stat. § 400.2-314 and Mo. Rev. Stat. § 400.2A-212.

354.    Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendant directly sold and marketed vehicles equipped with the defective engines to customers through authorized dealers, like those from whom Missouri Plaintiff and the Missouri Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Defendant knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Missouri Plaintiff and the Missouri Sub-Class Members, with no modification to the defective engines.

355.    Defendant provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

356.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for ordinary purposes; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

357.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their engines and the existence of the Engine System Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

358.    As a result of GM's breach of the applicable implied warranties, Missouri Plaintiff and the Missouri Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine System Defect, Missouri Plaintiff and the Missouri Sub-Class Members were harmed and

suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

359.    Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Mo. Rev. Stat. § 400.2-314 and Mo. Rev. Stat. § 400.2A-212.

360.    Missouri Plaintiff and the Missouri Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

361.    Missouri Plaintiff and the Missouri Sub-Class Members were not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the Engine System Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

362.    As a direct and proximate cause of Defendant's breach, Missouri Plaintiff and the Missouri Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Missouri Plaintiff and the Missouri Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

363.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Missouri Plaintiff and the Missouri Sub-Class Members have been damaged in an amount to be proven at trial.

**FOURTEENTH CAUSE OF ACTION**

**(Breach of Express Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303**
***et seq*.)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendant)**

364.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

365.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Class against Defendant.

366.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain.

367.    The Engine System and its component parts were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

368.    In a section entitled "New Vehicle Limited Warranty," Defendant's express warranty provides, in relevant part, that it "covers repairs to correct any vehicle defect related to materials or workmanship occurring during the warranty period, excluding slight noise, vibrations, or other normal characteristics of the vehicle. Needed repairs will be performed using new, remanufactured, or refurbished parts." The warranty further provides that "Warranty repairs, including towing, parts, and labor, will be made at no charge."

369.    Defendant breached the express warranties by selling and leasing Class Vehicles with Engine Systems that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the Engine System and its component parts. GM has failed to "repair" the defects as alleged herein.

370.    Plaintiffs were not required to notify GM of the breach or were not required to do so because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the defect from complaints and service requests they received from Class Members, from repairs and/or replacements of the Engine System, and from other internal sources.

371.    Plaintiffs also provided notice to GM of its breach of warranty claims under the MMWA by letter dated February 19, 2026.

372.    As a direct and proximate cause of Defendant's breach, Plaintiffs and the other Class members have suffered, and continue to suffer, damages, including economic damages at

the point of sale or lease. Additionally, Plaintiffs and the other Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

373.    Plaintiffs and the other Class members are entitled to legal and equitable relief against Defendant, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

**FIFTEENTH CAUSE OF ACTION**

**(Breach of Implied Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303**

***et seq*.)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes**

**Against Defendant)**

374.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

375.    Plaintiffs bring this cause of action on behalf of themselves and the Class against Defendant.

376.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

377.    Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

378.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

379.    GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Engine Systems manufactured, supplied, distributed, and/or sold by GM would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their Engine Systems would be fit for their intended use while the Class Vehicles were being operated.

380.    Contrary to the applicable implied warranties, the Class Vehicles and their Engine Systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead,

the Class Vehicles are defective, including the defective design and materials of their Engine Systems.

381.    Defendant's breach of implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

382.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

383.    Defendant has been afforded a reasonable opportunity to cure their breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and Engine System repair.

384.    As a direct and proximate cause of Defendant's breach of implied warranties, Plaintiffs and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

385.    As a result of Defendant's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

386.    Plaintiffs also provided notice to GM of its breach of warranty claims under the MMWA by letter dated February 19, 2026.

**SIXTEENTH CAUSE OF ACTION**

**(For Fraud by Omission or Fraudulent Concealment)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendant)**

387.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

388.    Plaintiffs bring this cause of action on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendant.

389.     Defendant knew that the Class Vehicles suffered from an inherent Engine System Defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

390.     Defendant concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

391.     Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

(a)     Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

(b)     The omitted facts were material because they directly impact the safety of the Class Vehicles;

(c)     Defendant knew the omitted facts regarding the Engine System Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

(d)     Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

(e)     Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

392.     The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Whether a vehicle's Engine System is defective, which can suddenly cause loss of propulsion, smoke, oil discharge, and fire risk that impairs the driver's ability to maintain control and avoid collision, is a material safety concern. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

393.     Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to

their detriment. This detriment is evident from Plaintiffs and Class Members' purchase or lease of Defendant's defective Class Vehicles.

394. Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continue to cover up and conceal the true nature of the problem today.

395. As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective Vehicles and recover damages.

396. Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SEVENTEENTH CAUSE OF ACTION**

**(For Unjust Enrichment)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes**

**Against Defendant)**

397. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

398. Plaintiffs bring this cause of action on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendant.

399. Defendant has received and retained a benefit from Plaintiffs and the members of the Class, and inequity has resulted.

400. As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class Vehicles, the value of which was artificially inflated by Defendant's concealment of and omissions regarding the Engine

System Defect. Defendant charged higher prices for the vehicles than the vehicles' true value, and Plaintiffs and Class Members thus overpaid for the Class Vehicles. Although these vehicles are purchased through Defendant's authorized dealers and distributors, the money from the vehicle sales flows directly back to Defendant.

401.    Additionally, as a direct and proximate result of Defendant's failure to disclose known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

402.    Defendant has been unjustly enriched due to the known defects in the Class Vehicles through the use of money paid that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiffs and Class Members.

403.    Plaintiffs and Class Members were not aware of the true facts regarding the Defect in the Class Vehicles and did not benefit from Defendant's unjust conduct.

404.    As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

405.    Plaintiffs do not seek restitution under their unjust enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

406.    Additionally, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

**RELIEF REQUESTED**

407.    Plaintiffs, on behalf of themselves and all others similarly situated, request the Court enter judgment against Defendant, as follows:

(a)    An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

(b)    A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the Engine System, including the need for periodic maintenance;

(c)    An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendant to repair and eliminate the Engine System Defect from every Class Vehicle; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(d)    An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(e)    Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(f)    A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles or make full restitution to Plaintiffs and Class Members;

(g)    An award of attorneys' fees and costs, as allowed by law;

(h)    An award of pre-judgment and post-judgment interest, as provided by law;

(i)    Leave to amend the Complaint to conform to the evidence produced at trial; and

(j)    Such other relief as may be appropriate under the circumstances.

**DEMAND FOR JURY TRIAL**

408.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of all issues in this action so triable.


Dated:  May 1, 2026

Respectfully submitted,

/s/Russell D. Paul
Russell D. Paul (#4647)
**BERGER MONTAGUE PC**
800 N. West Street, Suite 200
Wilmington, DE 19801
Tel.: 302-691-9545
rpaul@bergermontague.com

Adam A. Edwards
William A. Ladnier
**MILBERG, PLCC**
800 S. Gay Street
Suite 1100
Knoxville, TN 37929
Tel.: 865-247-0080
aedwards@milberg.com
wladnier@milberg.com

Tarek H. Zohdy
Laura E. Goolsby
Ahmed H. Yousef
**DRAKE LAW FIRM**
19935 Venture Blvd.,
Third Floor
Woodland Hills, CA 91364
Tel.: 888-315-5721
tarek@drakelawgroup.com
lgoolsby@drakelawgroup.com
ayousef@drakelawgroup.com


*Attorneys for Plaintiffs*
*and the Putative Class*